UNITED STATES of America,
Plaintiff,

v.

Herbert Charles BROOMFIELD, a/k/a H. Gomez; and Addie City, a/k/a Mrs. H. Gomez, a/k/a Mrs. Herbert Charles Broomfield, Defendants.

Crim. No. 46144.

United States District Court,
E. D. Michigan, S. D.

Jan. 11, 1972.

William Ibershof, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Donald F. Welday, Jr., Welday, Goldstone, Boila & Ott, Southfield, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

Defendants herein are charged with possession of 11 grams of heroin in violation of 21 U.S.C. Section 841(a) (1). A motion to suppress was filed on the grounds that the seizure of the said heroin (and other narcotics) was unconstitutional. Pursuant to the motion, an evidentiary hearing was held and testimony taken, including the testimony of the defendants and several government agents. A rather detailed factual summary is necessary to decision.

On July 8, 1971, Detroit-based agents of the Bureau of Narcotics and Dangerous Drugs received information via telephone from their counterparts in San Antonio, Texas, regarding an investigation of a narcotics conspiracy which involved a male and female known as Mr. & Mrs. H. Gomez. It was reported that Mr. & Mrs. H. Gomez had been in San Antonio the day before, had met with known narcotic violators and had enplaned for Detroit with, it was believed, one and one-half pounds of heroin. The San Antonio agents also provided a Detroit area telephone number allegedly used to contact the persons known as Gomez. At some time during the day Detroit agents were also advised that a federal indictment had been returned in San Antonio against these persons known as Gomez and others.

Investigation based on this information, which included physical descriptions, focused attention on one Herbert Broomfield and his wife, Addie, of 9919 Hartwell, Detroit, Michigan. It was discovered that Mr. Broomfield had a prior criminal record including convictions for carrying a concealed weapon and aggravated assault. Further, that he was known to be involved in the narcotics trade and to associate with other narcotic traffickers in the Latin-American community. The agents, considering his prior conduct and his current involvement, believed him to be volatile and dangerous.

Late in the afternoon of July 8, 1971, the Detroit agents planned the surveillance and arrest of the Broomfields with the participation of U. S. Customs agents. Very shortly after surveillance was established by two agents, it was determined that Mr. Broomfield was in front of the premises on Hartwell and that Mrs. Broomfield was leaving the premises. The latter was followed to a nearby pizza store and arrested by Agents Mateer and DePottey.

Mrs. Broomfield was well advanced in a pregnancy and had with her a small child. She expressed a desire to return to the home because of the child rather

than going "downtown". However, she was not returned immediately but temporarily retained in Agent Mateer's vehicle a short distance from the family residence.

Meanwhile, other agents (four or five) went to the Hartwell address and immediately observed Mr. Broomfield on his front lawn. He was quickly placed under arrest by Agents DePottey and Mahon and in the process was propelled to the front porch and searched. At the time of his arrest, Mr. Broomfield was dressed in Bermuda shorts and slippers and perhaps a T-shirt. After being warned of his rights under the Miranda rule, Mr. Broomfield indicated that the situation was embarrassing and asked if they could go into the house. The agents readily acquiesced and entered the house with Agent Mahon leading the way, followed by Mr. Broomfield and Agent DePottey. This threesome was followed by other agents including Customs Agent John Verklan.

At this point, a rough description of the residence at 9919 Hartwell would be helpful. The residence is located on a lot of approximately 50 feet in width and 100 feet in depth. It is a one and one-half story bungalow with a full basement. The first or ground floor consists of a living room with a dining area, two bedrooms, kitchen and bath. The second floor, in effect a finished attic, consisted of the master bedroom and a large, walk-in closet.

Immediately upon entering the home, several agents spread throughout the house in accordance with regular police procedures to "secure" the premises, that is, to assure that there were no others in the home who could cause harm or present some danger. Customs Agent Verklan was the officer who went up the stairs to the second floor bedroom. While surveying the upstairs portion of the house, he saw, in the walk-in closet, several handguns and long guns, and some "lactose" (a substance commonly used to "cut" heroin). He also saw, on a vanity dresser in the bedroom, a small shoe box containing a substance which

appeared to be marijuana and a small bottle containing a white powdery substance. His observations prompted him to relate them to Agent Mateer and to advise that a search warrant be obtained.

Agent Mateer, who had returned to the premises with Mrs. Broomfield after having been advised that the arrest of Mr. Broomfield had been effectuated and it was safe to return, thereupon went to the second floor and also observed the items Agent Verklan had seen and some additional ones, i. e., small scales commonly used to weigh quantities of heroin, coin envelopes commonly used to package heroin and several containers whose contents appeared to be methadone and amphetamines.

Mr. Broomfield was then taken to the offices of the Bureau and later to the Wayne County Jail until his arraignment on the morning of the next day, July 9. Mrs. Broomfield was permitted to remain on the premises at Hartwell with her children and her sister, but two agents remained on the premises also. None of the items observed that were believed to be contraband, with the exception of the firearms, were removed prior to the execution of the search warrant.

The search warrant was obtained the next morning (after attempts to obtain one that night were unsuccessful) and was executed by agents after Mr. Broomfield's arraignment and release.

Special note is taken of the defendants' witness Jimmie Beasley, a friend, near-neighbor and frequent visitor of the defendants. Mr. Beasley testified that he approached the defendants' home intending to visit them and saw Mr. Broomfield start to run, saw a "big guy" try to kick him, saw Mr. Broomfield run up the (porch) stairs and saw this "guy" push him against the front of the house. Mr. Beasley "took off" because he thought it was a "rip off" (which this Court understands is the vernacular for a hold-up, robbery or similar violent act). Mr. Beasley did not think the men he saw in the area

around the house were police. Mr. Beasley returned home but, oddly enough, did not call the police to the scene of this "rip off".

## Discussion

Paramount in any discussion of search and seizure cases which do not fall readily into the factual mold of a previously decided set of circumstances is the recent case of Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. No better starting point in the analysis of that case can be found than the opening paragraph of the late Justice Harlan's concurring opinion, where he wrote:

"From the several opinions that have been filed in this case it is apparent that the law of search and seizure is due for an overhauling. State and federal law enforcement officers and prosecutorial authorities must find quite intolerable the present state of uncertainty, which extends even to such an everyday question as the circumstances under which police may enter a man's property to arrest him and seize a vehicle believed to have been used during the commission of a crime."

Faced, as we are, with the "present state of uncertainty," the analysis of Coolidge, supra, and other pertinent decisions must necessarily be minute and the resultant application to this case meticulous.

In Coolidge, supra, police arrested the defendant in his home pursuant to a valid arrest warrant. His automobile, which police believed to be an instrumentality of the crime, was parked in the driveway at the time of the arrest and was seized and subsequently searched pursuant to a search warrant which the Court found to be invalid. At issue, then, was whether the seizure and subsequent searches of the automobile could be constitutionally validated in the absence of a legal search warrant.

It is patent, of course, that the factual situation in Coolidge is distinguishable from that at bar. However, Coolidge's particular significance is the exhaustive exegesis of Justice Stewart and the responses and reactions of other Justices in this multi-faceted decision. Therein, hopefully, we will find some expression of attitudes which will serve us in the determination of this difficult case.

The basic principle concerning searches and seizures under the current interpretation of the Fourth Amendment is stated in Justice Stewart's opinion as follows:

" 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment —subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' "

Justice Stewart then goes on to discuss three of the "exceptions" to the rule advanced by the prosecution as justifying the seizure, first, that the seizure and subsequent search were "incident" to a valid arrest; second, that police may make a warrantless search of an automobile whenever they have probable cause to do so; and, third, that the car itself was an "instrumentality of the crime" and as such might be seized because it was in plain view. Only the first and third exceptions need concern us here.

## Search Incident to Arrest

■ In the case at bar, the arrest (the validity of which is not contested) was effected outside of the house. Therefore, no search of the inside of the house is permissible as being incident to the arrest (Coolidge, supra, p. 456, 91 S.Ct. 2022, 29 L.Ed.2d 564, and cases cited therein) unless other factors are present.

Assuming, arguendo, that although the arrest was made outside of the house but that defendant consented to the entry of the police into the house, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, blocks any substantial assertion that the way was thereby opened to a search of the entire premises, including the second floor bedroom, particularly while the defendant was custodially confined to the first floor living room. Whatever may have occurred later (when agents took defendant to the bedroom to complete his dress), *Chimel* is commandingly explicit in denying justification to searches which extend beyond the arrestee's person and the area within his immediate control.

### The Plain View Doctrine

If, then, the search is to be justified here, it must be justified on the grounds of the plain view doctrine, since, as stated in *Coolidge*, 403 U.S. pg. 465, 91 S.Ct. pg. 2037:

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant."

Justice Stewart, in the same paragraph, also articulates the enigma produced by "doctrines" such as this, as follows:

"The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal."

Perhaps the most viable definition of the plain view doctrine, considering the restrictive influence of the concurring and dissenting opinion of *Coolidge* is found in the following language, pg. 466, 91 S.Ct. p. 2038:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused."

There are, therefore, two distinct limitations included in the definition:

One: prior justification for the intrusion, and

Two: inadvertent viewing.

The Court has recognized several instances in which the intrusion is justified: by virtue of a valid warrant, or by virtue of "exceptions". Justification by virtue of a valid warrant contemplates instances where while searching for items specifically described in, for example, a search warrant, objects not included in the search warrant are observed in plain view. (*Coolidge,* pg. 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 and cases cited therein). Justification by virtue of an "exception" is, of course, the crucial issue here and must be discussed with care and in detail.

The cases cited by Justice Stewart as constituting "exceptions" which justify the initial intrusion (or, conversely, do not rise to the level of a recognized exception) can be characterized by the term, and the presence of, "exigent circumstances". That is to say, that "plain view *alone*" (emphasis added) is not a sufficient basis to justify a warrantless search, there must also be, contemporaneously, an urgency or immediacy that is pervading and compelling. Thus, the classic example of "hot pursuit" as in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, where the Court said:

" . . . neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, 'the exigencies of the situation made that course imperative.' . . . They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against

them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."

It is within this context that we review the facts in this case pertinent to the issue of whether the agents' initial intrusion in the upstairs bedroom was justified.

However, before that ultimate question is reached, there is present the threshold issue of the legality of the entry into the house. This, of course, can only be justified if the defendant consented to entry or invited the agents into his home.

It is not unusual that many evidentiary hearings held in the trial courts regarding searches and seizures revolve around the issue of consensual or permissive search and not infrequently the more specific issue is the search that results from taking an arrestee into his bedroom to change or don clothing preparatory to his trip "downtown". (See Giacalone v. Lucas, 445 F.2d 1238 (6th Cir., 1971).) So, here, it appears reasonable and highly credible that the defendant requested that he and the agents enter the house, not only because it was embarrassing for the defendant to have this tableau unfold in view of his neighbors, but also, considering his minimal attire, to change his clothes. (Again, see Giacalone, where the officer "suggested" the arrestee change his clothes and the latter readily accepted the suggestion, pg. 1245.)

Once having gained lawful entry into the house, had a search been limited to the area delineated by Chimel, supra, and the narcotics found, our task would be much simpler. We are not, of course, granted that surcease, for, as indicated above, immediately upon entry by the defendant and the two arresting agents, another agent ran quickly up to the second floor while others "fanned out" through the house. We arrive then directly and forcibly against the term "exigent circumstances" in order to avoid the import of Chimel, supra. (Cf. Lewis v. United States, 385 U.S. 206, 87 S. Ct. 424, 17 L.Ed.2d 312, where the Court said:

" . . . Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials; . . . ")

The "exigent circumstances" relied upon here by the government was the apprehension that other persons may have been in the house who would have come to the aid of the defendant and could have caused harm to the agents in the house or in the vicinity. There was testimony that it is good police procedure to "secure" the premises when entry is made. Police policy or procedure is not, of course, a critical feature in determining such issues. The crucial factor is whether the agents had justifiable reasons for "fanning out" and "securing" the premises, including the upstairs floor. This Court is of the opinion that the agents acted reasonably and properly under the circumstances.

The information made available to the agents certainly warranted the utmost caution and circumspection. The man they believed to be the indictee in Texas, was allegedly a member of a conspiracy dealing in illegal drugs. It is significant that, according to their information, this man, accompanied by his wife flew to Texas and returned within approximately 24 hours after meeting with known narcotics sellers, from whom it was believed he had obtained a quantity of illegal drugs. This does not bespeak of a minor or solo participant in drug traffic. Additionally, the prior criminal record and association of the

185

defendant indicated a propensity towards violence. Indeed drug trafficking itself is, as of this time and place, a violence-prone business. Knowing also that the defendant's wife was not on the premises (the presence of the second child was apparently unknown to the agents until later) and not knowing the immediate reasons for the entry of the arresting officers with the defendant, it would seem foolhardy for the agents to have refrained from conducting a search for other persons on the premises.

It is an elementary rule that the fact that some evidentiary or incriminating object is found does not serve to justify an otherwise illegal search, likewise the fact that a small arsenal was found in the upstairs closet does not prove the reasonableness of the agents' belief of possible danger from a confederate or accomplice. However, defendant's prior conviction for carrying a concealed weapon permits an inference that weapons may be located on the premises and any confederate or accomplice could have access to them.

Parenthetically, the agents' reasonable belief derives vicarious corroboration from the defendants' witness and friend who, coming on to the pre-arrest scene, thought it was a "rip off" and did not believe the persons attacking his friend were police officers.

In determining this issue of the "exigent circumstances" as permitting the search, we are admonished that the good faith of the police officers is also a concomitant question. As was said in the *Giacalone* case, *supra*, 445 F.2d pg. 1246:

"We do not dispute Appellant's contention that an arrest may not be used as a mere subterfuge by law enforcement to gain otherwise impermissible access to a person's house, papers and possessions." (Citation omitted.)

The question of good faith is purely a factual one and certainly the credibility of the witnesses is of great importance. This Court was impressed by the candor and sincerity of the government's witnesses. Further, it stretches credulity to find that the agents from various governmental agencies conspired, even tacitly, to effectuate the occurrences at the time of arrest. The agents believed that the narcotics obtained by the defendants had been distributed by the time of their planned function. They were, however, concerned that some violence could erupt, as witness the number of agents used on the arrest force and their retention of Mrs. Gomez away from the home (which she requested to be taken to) until it was safe to do so. Additionally, here there was no generalized search for narcotics or other evidence in drawers, desks or other places not open to view, but a quick, spontaneous search for anyone who might cause harm or place the police officers in jeopardy. The agents had not had ample time for surveillance which would permit any conclusion that no one else was in the house. Admittedly, they could have quickly placed the defendant in a car and removed him from the area post haste. Yet, circumstances here are not only fast moving but unstable. It is simplistic in such circumstances to hold, at this time, that the defendant should have been whisked away.

The other facet of the plain view doctrine is the one of "inadvertence". The Customs agent who observed the illegal drugs and other drug-related paraphernalia made his observations while searching for a confederate, accomplice or another who might do harm. There is no indication that the purpose of his search was to find illegal drugs. His intrusion into the walk-in closet which gave entry to the eaves was plausible and prudent.

The Supreme Court in *Coolidge, supra*, defines the parameters thusly: 403 U.S. pgs. 469, 470, 471, 91 S.Ct. pg. 2040:

"The second limitation is that the discovery of evidence in plain view must be inadvertent. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search

into a 'general' one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.' "

Continuing, *Coolidge* also hyphenates significantly in the following excerpt (pg. 471, 91 S.Ct. pg. 2040):

"The initial intrusion may, of course, be legitimated not by a warrant but by one of the exceptions to the warrant requirement, such as hot pursuit or search incident to lawful arrest. But to extend the scope of such an intrusion to the seizure of objects—*not contraband nor stolen nor dangerous in themselves*—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure." (Emphasis supplied.)

To this Court, the observations were, in fact, inadvertent, the objects in plain view and with the added feature of contraband in the picture, it follows that the search was reasonable.

As to the eventual seizure (after a search warrant was obtained, but while agents had control of the premises), nothing more need be said than to refer to Chambers v. Maroney, (1970) 399 U.S. 42 at pages 51–52, 90 S.Ct. 1975 at page 1981, 26 L.Ed.2d 419:

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

See also United States v. Garner, 6th Circuit, 451 F.2d 167, decided November 26, 1971.

Defendants' motion to suppress is hereby ordered denied.