140 N.J. Super. 368 (1976)
356 A.2d 401
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
WILLIE D. SMITH, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1975.
Decided April 7, 1976.
*369 Before Judges CARTON, CRAHAY and HANDLER.
Mr. Gary H. Schlyen, Assistant Prosecutor, argued the cause for appellant (Mr. Burrell Ives Humphreys, Passaic County Prosecutor, attorney).
*370 Ms. Randall W. Westreich, Assistant Deputy Public Defender, argued the cause for respondent (Mr. Stanley C. Van Ness, Public Defender, attorney).
The opinion of the court was delivered by HANDLER, J.A.D.
Defendant was charged by indictment with armed robbery and pleaded not guilty. He then moved to suppress the use as evidence against him of a certain gun. A hearing was held and the motion was granted. The State then obtained leave to appeal.
The sole witness for the State at the suppression hearing was Detective Gourley of the Paterson Police Department. He testified that on a certain date, at 8:30 A.M., he and two other detectives went to an apartment rented by one Shirl Bouier in order to execute a warrant for the arrest of one Marvin Higgins. Although the address indicated as Higgins' on the warrant was different, the detectives had information that Higgins would be at the Bouier apartment.
They were admitted into the apartment by a maintenance man who used a pass key and entered, apparently without announcing their purpose or authority. On entering the detectives saw Higgins in the living room. Higgins threw a paper bag onto the floor and reached into the pocket of his bathrobe. Gourley told Higgins to take his hands out of his pocket and put them in the air. Detective Brejack then removed a gun from the bathrobe pocket. The discarded bag contained six smaller bags, each of which contained a white powder which Gourley believed to be narcotics. There were also narcotic implements on a living room table. Sitting at a kitchen table near the living room were two other men and Gourley saw on the table narcotic implements consisting of hypodermic needles, a cooker and glassine envelopes.
The detectives proceeded to search the rest of the apartment. Detective Ragucci remained in the living room where he detained Higgins and the two other men, while Gourley and Brejack went down the hallway to the master bedroom about 35 feet away.
*371 The door to the bedroom was open and the detectives saw defendant and Bouier asleep in the bed. Gourley awakened them and told them to get dressed and get out of the room. He did not arrest them or tell them that they were under arrest but he watched them from the bedroom door as they were getting dressed. Meanwhile Brejack actually entered the bedroom. Gourley saw Brejack turn around from the dresser with a gun in his hand, a loaded .22-caliber revolver, which is the subject of the suppress motion. Brejack also found a shotgun in the closet. Brejack did not testify and Gourley could only state that the revolver was found "in or on the dresser."
After the guns were found defendant and Bouier were taken into the living room to join the others. At that point Gourley detained them all in the living room while Brejack and Ragucci went back to check other rooms where they found defendant's brother asleep in one bedroom and children asleep in another.
The sole witness for the defense was Shirl Bouier, who indicated that the apartment was hers and defendant occasionally spent nights there.
The trial judge concluded that upon entering the bedrooms there was no contraband or evidence in plain view and that no one was seeking to hide anyone, and there was no "risk or hazard to [the] safety" of the officers. Accordingly, he ruled that the failure to obtain a search warrant under these circumstances required suppression of the evidence seized. We disagree and reverse.
At the outset we determine that the search in question cannot be upheld as one incidental to the arrest of defendant. Defendant himself had not been placed under arrest at the time the revolver in the bedroom was taken by the police officer. Nevertheless, the principles applicable to a search incidental to arrest, as articulated in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), have some pertinency to this case.
*372 Though the United States Supreme Court has never ruled on it, some state courts and lower federal courts have recognized an amplification of the Chimel rule where more than one person may be present at the time of an arrest. Thus, where police have reason to believe in connection with the arrest of an individual that there may be danger from third parties on the premises, they may then "fan out" and conduct a protective sweep of the area. E.g., United States v. Looney, 481 F.2d 31 (5 Cir.1973), cert. den. 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 476 (1973); United States v. Briddle, 436 F.2d 4 (8 Cir.1970), cert. den. 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971); United States v. Broomfield, 336 F. Supp. 179 (E.D. Mich. 1972); State v. Miller, 126 N.J. Super. 572 (App. Div. 1974). But cf. United States v. Erwin, 507 F.2d 937 (5 Cir.1975); United States v. Cooks, 493 F.2d 668 (7 Cir.1974), cert. den. 420 U.S. 996, 95 S.Ct. 1437, 43 L.Ed.2d 679 (1975); United States v. Gamble, 473 F.2d 1274 (7 Cir.1973).
The cases cannot be completely reconciled. Those which have sustained such searches generally seem to place great weight on whether or not the arrestee is reasonably believed to be dangerous and whether or not he is likely to have accomplices. For example, in United States v. Broomfield, supra, the arrest was for a narcotics offense. The court held that since "drug trafficking itself is * * * a violenceprone business," it was permissible for the police to act in "apprehension that other persons may have been in the house who would have come to the aid of the defendant and could have caused harm to the agents." 336 F. Supp. at 184-185. In United States v. Looney, supra, the search was justified by the arrestee's "known propensity for using confederates" in conjunction with "the heinous nature" of the crime for which the arrest was made. In State v. Miller, supra, a protective search of an attic was undertaken when the officer who had made an arrest downstairs for a narcotics offense heard "a lot of creaking" overhead. The court concluded that the noises could lead the officer to believe *373 that other persons were present and that policemen had become targets of criminals. Id. 126 N.J. Super. at 575.
In this case the trial judge clearly was in error in determining that there was no "risk to the safety" of the police officers. Regardless of the officers' failure to articulate feelings of fear or apprehension for personal safety, the peril of the situation was patent. The policemen were in fact confronted with a clear, immediate and continuing danger upon their entry of the apartment, Higgins was sought for armed robbery, a crime of violence; he was actually armed and in fact reached for his gun; there were two other men present engaged in narcotics activity. Moreover, the apartment was apparently large, with several other rooms, and the owner herself was not visibly present. In this setting it would have been preposterous to assume that other confederates might not be in the apartment and would not have the means of resisting the efforts of the police or otherwise imperiling them. Indeed, it would have been "foolhardy for the [police not to] search for other persons on the premises." United States v. Broomfield, supra at 185.
A protective or "fan out" search is justified by the need for the police to make sure no third parties are present who might endanger them. It follows, of course, that if such persons are found, the police may take reasonable measures to avert any physical threats of harm. Such steps would sanction the frisking of any persons who are found, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as well as the confiscation of evidence in plain view, e.g., Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Also permitted would be a search of areas within the immediate control of those third parties, and a search of such areas, as in Chimel itself, may be directed to weapons not in plain view. See United States v. Manarite, 314 F. Supp. 607 (S.D.N.Y. 1970), aff'd 448 F.2d 448 (2 Cir.1971).
*374 The record in the present case does not indicate one way or the other that the gun in question was seized in plain view. The detective stated that it was either in or on the dresser; and since the burden of justifying a warrantless search is on the State, e.g., Chimel v. California, supra, 395 U.S. at 762, 89 S.Ct. 2034; State v. Allen, 113 N.J. Super. 245 (App. Div. 1970), it must be assumed that it was in the dresser and not plainly visible.
The record does not clearly yield any indication that the dresser was within the "immediate control" of defendant. United States v. Manarite, supra. Nevertheless, though it was not shown that the dresser, or for that matter the closet, was within the immediate control of defendant and Bouier, there is nothing to counter the natural inference that these areas were readily accessible to the occupants of the bedroom and probably within their easy reach. They had been directed to get out of bed and to dress, and the dresser and closet would undoubtedly be places they might have gone to for clothing or for personal belongings. Cf. United States v. Broomfield, supra. Thus, the brief search of a bedroom dresser, where two unclothed persons had just been aroused from bed and directed to dress under circumstances which would generate a solid belief that they posed a threat to safety because associated with obviously dangerous criminals actually engaged in criminal activity, was a reasonable measure to assure the safety of the police officers.
Accordingly, the judgment granting the motion to suppress is reversed.