STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JOHN
WELSH, JR., DEFENDANT–RESPONDENT.

Argued November 26, 1979—Decided September 18, 1980.

James T. O'Halloran, Deputy Attorney General, argued the cause for appellant (John J. Degnan, Attorney General of New Jersey, attorney).

James A. Vigliotti, Assistant Deputy Public Defender, argued the cause for respondent (Stanley C. Van Ness, Public Defender of New Jersey, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

The issue presented by this appeal is whether the police may constitutionally conduct a warrantless search of an automobile when the driver is stopped on a public highway and arrested pursuant to a lawful arrest warrant. Under the circumstances of this case the question must be answered in the negative. We reaffirm that the scope of a search incident to an arrest must be limited to the person of the arrestee and the area within his immediate control, as mandated by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

I

On November 26, 1976 New Jersey State Police Officer Thomas R. Spivey and his partner stationed themselves in the parking lot of a New Brunswick bowling alley. They had obtained a warrant for the arrest of defendant, John Welsh, Jr., eight days earlier and had been informed that he would be at the bowling alley that day to pick up a bowling ball.[1] In plain clothes and in an unmarked car, the troopers waited four or five hours for Welsh to arrive. About an hour before the troopers arrested defendant, they called for uniformed State Police to assist them in executing the arrest warrant. When Welsh came out of the bowling alley, he drove his car, a 1975 MG Midget, onto an adjacent highway. Thereupon the uniformed trooper signalled Welsh to stop, and Officer Spivey and his partner pulled up behind Welsh's car. After identifying himself as a New Jersey State Trooper, Officer Spivey read Welsh the arrest warrant, ordered him out of the car, and informed him of his *Miranda* rights. *See Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

After that, according to Spivey's testimony, the troopers "had a problem" with Welsh because of the presence in his car of his two or three year old son. The officers determined that they could avoid any difficulty arising from the boy's presence by allowing defendant to drive his car back to the State Police barracks in Princeton. Accordingly, Spivey "checked the vehicle to make sure there was nothing in the vehicle that would be destroyed in–ride * * *." He searched the interior of the car, looking for "any evidence or any fruits of the crime of bookmaking." Being familiar with the design of the MG Midget, Spivey reached up behind the dashboard and uncovered two envelopes secreted in the maze of wires there. The envelopes contained money and betting slips.

---

[1] The arrest warrant was issued in the course of a three–month investigation of the alleged sale of lottery tickets. The defendant does not challenge the validity of the arrest warrant.

Upon discovery of this contraband, the troopers changed their plan and transported Welsh and his son to the police station in a police car.[2] Defendant's car was towed to the station.

Welsh was charged with a variety of bookmaking and conspiracy offenses. His motion to suppress the evidence found in the search of his car was denied. The trial judge reasoned that considering the factual circumstances surrounding the arrest and the nature of the charges, "wisdom would dictate that they search the vehicle first to see if there was contraband in it before allowing him to get back in it."

Pursuant to a plea bargain defendant thereafter pleaded guilty to possession of lottery slips in violation of *N.J.S.A.* 2A:121–3 and conspiracy to violate the lottery laws contrary to *N.J.S.A.* 2A:98–1 and –2 (superseded by *N.J.S.A.* 2C:37–1 to –9 (gambling) and 2C:5–2 (conspiracy)). The remaining counts of the indictment were dismissed on recommendation of the State. Defendant was sentenced to two to three years in New Jersey State Prison.

On appeal the Appellate Division reversed the trial court's denial of defendant's suppression motion, vacated the guilty pleas, and reinstated the dismissed counts of the indictment. In doing so it rejected the State's attempt to characterize the search as incident to an arrest or as reasonable in light of the totality of the circumstances. The court held that the police could not be permitted to benefit from circumstances of their own making, relying on *Chimel v. California, supra,* and *United States v. Griffith,* 537 *F.*2d 900 (7th Cir. 1976). 167 *N.J.Super.* 233, 236–37 (1979). We granted certification, 81 *N.J.* 280 (1979), and now affirm.

---

[2]The officers' change in procedure resulting in their transporting Welsh and his son in the troop car first came to light at oral argument before us, it not having been available to the attorneys until shortly prior to argument. The Appellate Division was, of course, unaware of this factual development and hence its opinion makes no reference to this feature of the case.

## II

As we recently observed in *State v. Patino*, 83 *N.J.* 1 (1980):

> The *prima facie* invalidity of any warrantless search is overcome only if that search falls within one of the specific exceptions created by the United States Supreme Court. Where, as here, the State seeks to validate a warrantless search, it bears the burden of bringing it within one of those exceptions. [*Id.* at 7 (citations omitted).]

In this case the State seeks to justify the search under the "automobile exception" to the Warrant Clause, *Carroll v. United States*, 267 *U.S.* 132, 45 *S.Ct.* 280, 69 *L.Ed.* 543 (1925), or alternatively as incident to a lawful arrest pursuant to an arrest warrant, *Chimel v. California, supra*. We consider the contentions in that order.

## III

The State looks first to the automobile exception to validate the warrantless search here. Under that exception, first articulated in *Carroll v. United States, supra*, the police can stop and search a moving or readily movable vehicle when there is probable cause to believe that the vehicle contains evidence of criminality. As noted in *Patino, supra*, the exigent circumstances created by the inherent mobility of vehicles and the somewhat lessened expectations of privacy in one's vehicle furnish the rationales for this exception. 83 *N.J.* at 9–10; see *Cady v. Dombrowski*, 413 *U.S.* 433, 441–43, 93 *S.Ct.* 2523, 2529, 37 *L.Ed.* 2d 706, 715 (1973).

As is readily apparent, an essential ingredient of the automobile exception is probable cause to believe a "car contains articles that the police are entitled to seize." *Chambers v. Maroney*, 399 *U.S.* 42, 48, 90 *S.Ct.* 1975, 1979, 26 *L.Ed.*2d 419, 426 (1970); see *Patino, supra*, 83 *N.J.* at 10. Addressing the "probable cause" requirement, the State contends that the nature of the offenses for which the defendant was arrested–particularly the unlawful possession and sale of lottery slips–"bears significantly on the reasonableness of the belief that defendant's car could contain contraband." In part the argument hinges on the

premise that there are a variety of ways in which an automobile can serve as an instrumentality of the offense of possession of lottery slips.

Although these contentions have a certain conceptual validity, they hardly serve to carry the State's heavy burden of establishing such probable cause as would justify the search in this case. See *Patino, supra,* 83 *N.J.* at 13. While it is no doubt true that an automobile is an instrumentality of gamblers, the peripatetic nature of an illicit activity does not supplant the constitutional protection accorded to *all* members of society, whether roving or rooted. The fact that participants in book-making operations use automobiles does not, without more, give the police free rein to search vehicles at will. Similarly, the presence of an eight day–old arrest warrant does not alone provide probable cause to search the automobile of the arrestee. While in some cases the element of probable cause justifying a warrantless arrest will also justify a warrantless search, see, *e. g., Chambers v. Maroney, supra,* 399 *U.S.* at 47 *n.* 6, 90 *S.Ct.* at 1979 *n.* 6, 26 *L.Ed.*2d at 426, this is not such a case. Indeed, the circumstances here appear to support the converse proposition, namely, if the police had probable cause to believe the automobile was an instrument of illicit activity, they should have obtained an arrest warrant for that activity. *State v. Ercolano,* 79 *N.J.* 25, 46–47 (1979).

Accordingly, the search of the car has not been justified as within the automobile exception, and therefore the evidence seized must be suppressed unless admissible on some other grounds.

## IV

The State also seeks to justify the vehicle search as incident to the arrest of the defendant. The rationale for and permissible scope of such searches are authoritatively defined by the United States Supreme Court in *Chimel v. California, supra,* in this key section from the opinion:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"–construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs–or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well–recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less. [395 *U.S.* at 763, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694 (footnote omitted).]

Although *Chimel* involved the search of a house, its analysis may be applied to searches of automobiles as well. *Patino, supra,* 83 *N.J.* at 8; 2 W. LaFave, *Search and Seizure* § 7.1(a) (1978). *See also United States v. Chadwick,* 433 *U.S.* 1, 14–15, 97 *S.Ct.* 2476, 2485, 53 *L.Ed.*2d 538, 550–51 (1977). "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire,* 403 *U.S.* 443, 461, 91 *S.Ct.* 2022, 2035, 29 *L.Ed.*2d 564, 580 (1971). Rather, the trend in both this Court and the United States Supreme Court has been to accord an increased amount of Fourth Amendment protection to automobile searches in recognition of the fact that "automobile travel is a basic, necessary and pervasive way of American life." *Delaware v. Prouse,* 440 *U.S.* 648, 662, 99 *S.Ct.* 1391, 1400, 59 *L.Ed.*2d 660, 673 (1979); *Patino, supra,* 83 *N.J.* at 8.

In analyzing the validity of warrantless searches, the strands of constitutional exceptions to the Fourth Amendment must be kept untangled. *See Chimel v. California, supra,* 395 *U.S.* at 764 *n.* 9, 89 *S.Ct.* at 2040 *n.* 9, 23 *L.Ed.*2d at 694. Where there is probable cause to search an automobile, the search is not dependent on an arrest. *Carroll v. United States, supra,* 267

*U.S.* at 158–59, 45 *S.Ct.* at 287, 69 *L.Ed.*2d at 554. Conversely, if there is no independent probable cause basis for the search, the mobility of the car and the nature of the offense are irrelevant. Rather, the arrestee's freedom of movement and the passage of time become the controlling factors. As noted by Professor LaFave, "the *Chimel* rationale relates to the arrestee's access to the place searched rather than the risk that the evidence might otherwise become unavailable." W. LaFave, *supra* at § 7.1(b).

The relevant facts, then, appear to be those which disclose what places the person under arrest presently could reach at the time the arrest is undertaken and how likely it is that he would attempt resistance or escape or destruction of evidence. Important considerations are whether the arrestee has been placed under some form of restraint, the positions of defendant and the arresting officer in relation to the vehicle, the difficulties to be encountered in gaining access to the vehicle or to the particular area therein searched, and the number of officers present as compared with the number of persons arrested or bystanders in the immediate vicinity. See W. LaFave, *supra* at § 7.1.

Application of these criteria to the facts before us mandates the conclusion that the search was not properly incident to an arrest and that the evidence obtained therefrom was properly suppressed. At the time of the search of defendant's car, he was handcuffed and seated in a police car parked to the rear of his own vehicle. There were at least three State Troopers present. Under these circumstances he could not reach even into other areas of the police car, let alone into his own vehicle. And given the presence of his young son, it was highly improbable that he could have, or even would have, sought means of resistance, escape, or destruction of evidence.

## V

Finally, we agree with the Appellate Division's conclusion that the search cannot be justified as legitimately precautionary on the ground that the police had decided to permit the

defendant to drive his own car to the police station after the arrest–a plan which we now know was abandoned after the search had been accomplished, see *n. 2 supra* at 351.

> We note first that the course of action which the arresting officer had in mind was not proposed to defendant, and it is not suggested that defendant in any way consented to the arrangement. The circumstances hypothesized do not appear to have emerged at any point from a state of unexpressed intention and in any event were such as would have been created entirely by the police. "They did not have the right to create a situation which gave them a pretext for searching beyond the area of defendant's immediate control." *United States v. Griffith*, 537 *F.*2d 900, 904 (7 Cir. 1976). [167 *N.J.Super.* at 236.]

Because there was no justification for the search of the defendant's automobile, the fruits thereof were properly suppressed.

Affirmed.

HANDLER, J., dissenting.

Although the majority has both correctly defined the question presented by this appeal and accurately identified the controlling principles, it has misapplied those principles and, in so doing, has reached an erroneous result. As the majority recognizes, "[t]he issue presented by this appeal is whether the police may constitutionally conduct a warrantless search of an automobile when the driver is stopped on a public highway and arrested pursuant to a lawful arrest warrant." *Ante* at 349. The controlling principles, as acknowledged by the Court today, are those regarding searches incident to lawful arrests, as enunciated in *Chimel v. California*, 395 *U.S.* 752, 762–763, 89 *S.Ct.* 2034, 2040, 23 *L.Ed.*2d 685, 694 (1969). *Ante* at 349. The conclusion that must be reached in applying these principles to the factual setting of the instant case, however, is that the search in question here was incident to a lawful arrest and was thus undeniably constitutional. I therefore dissent.

The circumstances of Welsh's arrest were neither complex nor ambiguous. The State Police had a warrant for his arrest for various gambling–related offenses and information that he would be visiting a particular bowling alley on that day. When Welsh emerged from that bowling alley, entered his small

foreign car with his two– or three–year–old son, and proceeded to drive away, the State Police officers immediately followed in their vehicles and directed him to pull to the side of the road. After reading the arrest warrant to defendant, the officers ordered him out of his automobile, handcuffed him, and placed him in a police cruiser. The presence of defendant's young son, however, raised valid concerns in the minds of the officers as to the most advisable method to transport defendant to the police station. The officers determined that "instead of . . . transporting him back to [the] Princeton [State Police barracks] for processing," it was preferable for them to "allow [Welsh] to drive his [own] car back down there where it wouldn't create a problem to his son." Prior to allowing defendant to reenter his automobile, however, the police conducted a limited search of the portions of that vehicle that would be within the immediate control of the driver thereof. It was during this limited search that the envelope containing cash and betting slips was discovered under the dashboard of the vehicle.

No one disputes the reasonableness or the validity either of the arrest of defendant Welsh or the arrest warrant under which that arrest was effected. See ante at 350; 167 N.J.Super. 233, 235 (App. Div. 1979). Moreover, even though Welsh remained under arrest, because of the "problem" created by the presence of his two or three–year–old son, the decision by the arresting officers to allow defendant to drive his own car to the State Police barracks was reasonable under the circumstances and constituted proper police procedure in such a situation.

There is no suggestion finding any support in the record or in the determination of the trial judge that the decision of the police officers to allow Welsh to drive his own vehicle, with his son, to police headquarters was in any sense contrived or pretextual. Obviously, had Welsh been allowed to drive his automobile to the police station, he would have been under custodial authority while driving; he would not have been free simply to drive away or escape from police control. Hence, any characterization of defendant as not being "under arrest" while driving under such restrictions and for the sole purpose of presenting himself

at the police station to complete the arrest procedures would be totally unrealistic.

It is in this context that the search of Welsh's car took place. The principles governing this warrantless search are those involving searches incident to lawful arrests. This doctrine was clearly stated and explained in *Chimel* as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"–construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. [*Chimel v. California, supra,* 395 *U.S.* at 762–763, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694.]

These principles are applicable to searches of automobiles, as the majority correctly acknowledges. *Ante* at 354; *State v. Patino,* 83 *N.J.* 1, 8, (1980).

The search here of Welsh's automobile prior to his reentry therein fits readily within the boundaries delineated by *Chimel.* As noted, at the time of that search, defendant was under arrest for several offenses, including gambling and conspiracy felonies. Viewed objectively, therefore, the arresting officers could legitimately have believed that either destructible evidence of those crimes or weapons were secreted in the vehicle. See *Scott v. United States,* 436 *U.S.* 128, 139 & n. 13, 98 *S.Ct.* 1717, 1724 & n. 13, 56 *L.Ed.*2d 168, 178 & n. 13 (1978); *State v. Snow,* 77 *N.J.* 459, 463–465, (1978); *cf. State v. Patino, supra,* 83 *N.J.* at 20 (Schreiber, J., dissenting) (the dispositive factor is "the totality of the circumstances"); *State v. Ercolano,* 79 *N.J.* 25, 54, 58 (1979) (Sch᾽ ib᾽. ᾽., dissenting); *id.* at 71 (Handler, J., dissentin᾽

Moreover, the granting to Welsh of permission to drive his automobile to the police station because of the unforeseen

presence of his young son, a situation not created by the arresting officers, constituted reasonable police procedure and did not in any way negate the fact that defendant was to remain under arrest even while so driving. The search of those portions of the vehicle that would have been within the immediate control of defendant thus constituted a reasonable search incident to a lawful arrest permissible under the *Chimel* exception. See *State v. Wausnock*, 303 *A.2d* 636, 637 (Del.Sup.Ct. 1973) ("the applicable standard of care is not to be measured solely at the moment of search when driver and passenger were outside the automobile; it is to be measured, also, as of the time when they may have been permitted to return to the automobile"); 3. W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4 at 136-137 (1978).

In the analogous situation in which an individual upon leaving his or her vehicle is properly "frisked" or searched under the "stop and frisk" doctrine of *Terry v. Ohio*, 392 *U.S.* 1, 20-22, 88 *S.Ct.* 1868, 1879-1880, 20 *L.Ed.2d* 889, 905-906 (1968), but not arrested, courts have upheld as proper a reasonable, limited search of the individual's vehicle since "defendants would have returned to their vehicle and, had there been a weapon, the weapon would then have been within the reach of the defendants." *State v. Brown*, 160 *N.J.Super.* 227, 234 (Law Div. 1978); *accord, State v. Wausnock, supra* 303 *A.2d* at 637; *State v. Darling*, 393 *A.2d* 530, 532-533 (Me.Sup.Jud.Ct.1978); *Commonwealth v. Almeida*, 373 *Mass.* 266, 272, 366 *N.E.2d* 756, 760 (Sup.Jud.Ct.1977).

Further, the limited search of Welsh's automobile did not exceed the permissible scope of the warrantless search standards enunciated by *Chimel*. The only areas of the vehicle actually searched were those that would have been within the immediate control of the driver thereof, specifically, under the dashboard. This is obvious from the fact that the officer discovered the envelope merely by reaching under the vehicle's dashboard. Also, the fact that the police here changed their plan for transporting Welsh after discovering under the dashboard the envelope which apparently contained evidence of gambling ac-

tivities does not retroactively impugn the propriety of the search, which was reasonable when made. See *ante* at 350 351, 355–356.

The majority's focus upon the fact that Welsh was handcuffed in a police car during the actual search of his automobile is misdirected. The search was being conducted at that moment not to secure or sanitize areas within Welsh's control or immediate reach; he was at that time effectively "neutralized." *Cf. State v. Mangold*, 82 *N.J.* 575, 587–588 (1980) (inventory search). Rather, it was undertaken in anticipation of allowing Welsh to drive his automobile, presumably without handcuffs. See *ante* at 355. Since the arrest here was valid and the decision to allow defendant to reenter and drive his own car was also reasonable police procedure under these circumstances, a *Chimel* –type warrantless search, *i. e.*, a search incident to a lawful arrest, would be entirely proper absent any showing of pretext on the part of the police officers. See *United States v. Griffith*, 537 *F.*2d 900, 904–905 (7 Cir. 1976); *United States v. Mason*, 523 *F.*2d 1122, 1125–1126 (D.C.Cir.1975); *State v. Smith*, 140 *N.J.Super.* 368, 373 (App.Div.1976), aff'd o.b. 75 *N.J* 81 (1977).

In the instant appeal, no convincing evidence of connivance or pretext on the part of the arresting officers has been demonstrated. The trial court in this respect credited the uncontradicted testimony offered by the State in support of the reasonableness of the search. There is thus no basis for a conclusion that the arrest of Welsh was defective or improper. I do not view any time lag between the issuance of an arrest warrant and the actual arrest itself as presumptive evidence of bad faith on the part of the police officers. The majority apparently does not share this view. See *ante* at 352, 353. I therefore disagree with the apparent finding made by the majority that a showing of such pretext has here been made. *Ante* at 355, 356; see 167 *N.J.Super.* at 236. In fact, the majority's approach itself is somewhat pretextual. It attacks the reasonableness of the arrest solely as an expedient to impugn the reasonableness of the search of defendant's automobile conducted as a constituent element of the arrest. As pointed out, however, there is no evidential basis for concluding that any of the arrest procedures employed here were unreasonable.

Since the facts presented by the instant appeal clearly constitute a search incident to arrest as defined by *Chimel*, I would make no finding as to the State's companion claim that this warrantless search was also permissible under the "automobile exception" to the general rule as set out in *Carroll v. United States*, 267 *U.S.* 132, 149, 45 *S.Ct.* 280, 283, 69 *L.Ed.* 543, 549 (1925).

In conclusion, I agree with the assessment of the trial judge that "wisdom would dictate that [the arresting officers] search the vehicle first to see if there was contraband in it before allowing [defendant] to get back in it," here defining contraband to include either weapons or destructible evidence.

Accordingly, I would reverse the judgment of the Appellate Division, thus reinstating the judgment and sentence of the trial court.

Justices SULLIVAN and SCHREIBER join in this opinion.

*For Affirmance* –Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD and POLLOCK -4.

*For reversal*–Justices SULLIVAN, SCHREIBER and HANDLER–3.