224 N.J. Super. 404 (1988)
540 A.2d 901
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
DRAKE BARKSDALE, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY IN THE INTEREST OF A.N.W., A JUVENILE.
Superior Court of New Jersey, Appellate Division.
Submitted March 14, 1988.
Decided April 21, 1988.
*406 Before Judges J.H. COLEMAN and O'BRIEN.
John H. Stamler, Prosecutor of Union County, for appellant (Dennis R. O'Brien, Assistant Prosecutor, of counsel and on the letter brief).
Alfred A. Slocum, Public Defender, for respondent Drake Barksdale (Mark M. Cheser, Designated Counsel, of counsel and on the letter brief).
*407 Alfred A. Slocum, Public Defender, for respondent A.N.W., a juvenile (Steven M. Gilson, Designated Counsel, on the letter brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
This appeal raises the question of when is a search of an automobile incident to a lawful arrest after the arrestee and other occupants are no longer inside the motor vehicle. The Law Division suppressed the use of evidence seized because the search was conducted pursuant to an administrative policy and not as an incident to a lawful arrest. We now affirm.
Defendant Drake Barksdale, Curtis McKoy and Joyce Fries were indicted under Union County Indictment No. 87-07-0828 for possession and possession with intent to distribute cocaine (crack) on April 8, 1987. Defendant Barksdale filed a motion pursuant to R. 3:5-7 to suppress evidence seized in a warrantless search. The motion was granted by the Law Division on October 6, 1987.
A.N.W. was charged in Complaint FJ-20-04519-87W as a juvenile with possession and possession of crack with intent to distribute on April 8, 1987. The juvenile filed a pretrial motion to suppress evidence seized in a warrantless search. A hearing on the motion was commenced on June 29, 1987. That day's hearing was closed without a decision on the motion. The hearing was continued on October 8, 1987 at which time the judge indicated that during the interim he learned that the Law Division had granted a suppression motion filed on behalf of an adult accomplice based on identical facts. The Family Part Judge applied State v. Gonzalez, 75 N.J. 181 (1977) and granted A.N.W.'s suppression motion. The judge also dismissed the Complaint FJ20-045-19-87W.
The State was granted leave to appeal both of the suppression orders. We consolidated these appeals. We now affirm the suppression orders.
*408 The facts are not complicated. On April 8, 1987, Peter Davis, a Springfield police officer, stopped a motor vehicle on Route 22 for operating without headlights. Curtis McKoy was the owner and operator of the motor vehicle. Four passengers were in the car at the time: Joyce Fries was the front passenger, Drake Barksdale, A.N.W. and B.W. were rear passengers. McKoy was asked for his driver's credentials. He stated that they were in the trunk. The policeman asked McKoy to get them from the trunk. While McKoy was looking in the trunk for his credentials, Detective Judd Levenson and Lieutenant Hietala arrived on the scene. A computer check on McKoy's driving record revealed that his New Jersey driver's license had been suspended. Officer Davis arrested McKoy for driving while on the revoked list. He also issued a summons for careless driving. McKoy was patted down, handcuffed and placed in the back seat of the patrol car operated by Officer Davis that was parked to the rear of McKoy's vehicle. Officer Davis remained inside or beside his patrol car after McKoy was arrested.
Officer Davis was asked whether his department has "a policy regarding search of vehicles in connection with arrest." His response was "we check the vehicles for contents of the vehicle, so there's no problem in the future of an individual saying something's missing or not." After the assistant prosecutor informed the court that the State was not relying on an inventory search, Officer Davis was asked the following questions to which he responded:
Q Are there any other reasons why you would conduct a search of the interior of the vehicle in connection with an arrest?
A Possible weapons inside the vehicle.
Q When did you make the decision that you were going to search the interior of Mr. McCoy's vehicle?
A When somebody's placed under arrest, we always make a search of the vehicle.
Q And when do you conduct that search?
A After the individual's placed in protective custody, such as in the back of the patrol car.
Q Did you in fact conduct the search of that vehicle right there and then as it sat on the roadway?

*409 A No, sir.
Q Why not?
A It was in an unsafe position. As I informed you earlier, the vehicle was somewhat into the slow lane of Route 22 and we were beyond the hillcrest, so traffic coming over the hillcrest couldn't see us for more than a hundred feet. It was a tough situation where the car was situated. And since the car was dead, apparently the reason he was driving with no lights on because his alternator was bad and he didn't want to drain the alternator. As I pulled the car over to the side, the car died and it was unable to run again.
Q Was the vehicle moved?
A The vehicle was moved.
Q Who made the decision to move the vehicle?
A Officer Levenson asked Mr. McKoy if it would be all right to push this vehicle into the defense building parking lot off the side of the road into a safe location.
Q And what did Mr. McKoy respond?
A He said it was okay. And the other occupants with Miss Fries at the wheel pushed the vehicle into the defense building parking lots.
Q Now, while this vehicle was being pushed into the defense building parking lot, where were you?
A I was located in my patrol car with the overhead lights on following the vehicle.
Q At what distance?
A Two car lengths, a car and a half length, somewhere about there.
Q Were there any other officers present at this time?
A Officer Levenson was present at the time following the vehicle behind it with a flashlight.
Q When you say following, was he in a car, on foot?
A He was on foot.
Q How far was he from the people pushing the car?
A Eight to ten feet, somewhere about there.
Q Now, what happened after the car was pushed into the parking lot?
A It was pushed approximately 75 feet down the shoulder of the road and into the defense building parking lot.
* * * * * * * *
Q Did you have the vehicle in your view, the defendant's vehicle in your view all during this time?
A That's right, my vehicle followed theirs into the parking lot.
Q Did you make any observations of the occupants of the vehicle after it came to rest?
A At this particular time Officer Levenson was out with the individuals of the vehicle and I was filling out the arrest sheets and an investigation form.
Q What happened next?

*410 A After several minutes, four, five minutes, three, four, I'm not really too sure, Officer Levenson came over to my vehicle and notified me he found a lot amount of what he suspected as crack inside the vehicle.
Q And then what happened?
A At this time I exited my vehicle. We placed Mrs. Fries under arrest where I gave her, her Miranda rights. As we were there, Mr. Barksdale who had gone over to the Lido Diner to make a phone call and came back and informed him of his Miranda rights and placed him under arrest. And at this time Lieutenant Hytella watched the two suspects. And Officer Levenson and myself went to the Lido Diner, which is adjacent across Route 22, for [A.N.W.] and [B.W.] who were making a phone call and placed them under arrest where I gave them both their Miranda rights.
Detective Levenson gave testimony that varied from that of Officer Davis. Detective Levenson testified that after the car had been pushed off the roadway, he observed A.N.W. "walk over to the passenger door, open it and reach into the vehicle." When A.N.W. returned to a standing position, Detective Levenson observed nothing in his hands. He then permitted Barksdale and B.W. to go to Lido Diner to make a phone call. As A.N.W. walked away from the car to go to the Lido Diner with the other two males, Detective Levenson said he walked up to the open passenger door and with the use of his flashlight he looked into the car and saw a clear plastic bag underneath the seat. He said he made that observation as he stood outside the motor vehicle. Inside the clear plastic bag, he observed small vials with blue plastic caps which he concluded contained crack. He retrieved the plastic bag and all of the occupants of the car were arrested.
The trial judge said that he had studied the briefs submitted before Detective Levinson testified. There was nothing in the State's brief which indicated that the State would rely on plain view. After Detective Levenson testified concerning plain view, the judge observed that he was having difficulty with the credibility of the State's case. The assistant prosecutor had the same problem. The ensuing colloquy between the assistant prosecutor and the judge is revealing:
MR. AMANN: [Assistant Prosecutor] I will submit this. I had the same concerns as far as you are concerned about smelling a rat or something like that. I for the first time got my information on this case different from what *411 was in the State's brief for the first time when McKoy, Curtis McKoy, the driver, who was going to be potentially a witness in this case was brought to my attention. I spoke to Mark Imbriani and Mark indicated that there was a potential of Mr. Cheser calling McKoy. At that time there was no change in the brief whatsoever.
I asked McKoy  I think the thing that is key and I would have a different view of this and I have my concerns with this as well. But as far as being above board, I want to make it absolutely clear on the record, the sequence of the events and the source of information that came to my attention. The plain view is not in the report. The plain view was never brought to my attention. The plain view, until I spoke with McKoy for the first time and in speaking with Gerry Ventri, who prepared the brief, I reviewed just her basis, she does the interview, I never saw plain view  do you have any questions, Gerry? The brief went on out. The defendant in this case is the first one that alerts me yesterday to plain view.
THE COURT: When did you alert the Court or your adversary that all of a sudden this is going to be a plain view motion and perhaps he might need more time to prepare for this motion and I might do additional research than we do? None of your brief or his brief has brought up plain view. I think it's too late, what do you think about that? Why should I hear plain view now?
MR. AMANN: Pardon?
THE COURT: Why should I hear plain view now?
MR. AMANN: Because of the circumstances there's no bad faith on the State's part, because the law in plain view is absolutely straight forward, there's not a brief prepared on it. What we're dealing with is a factual scenario that comes to us out of the mouth of the defendant himself.
THE COURT: Where does your factual scenario indicate that even there's a possibility of plain view? Forget about the law. Even assume I know the law on plain view, where does your factual scenario say there's any inkling of plain view in this case?
MR. AMANN: Based on the testimony 
THE COURT: No, no, in your brief.
MR. AMANN: Absolutely none.
At the conclusion of the suppression hearing, the judge rejected the State's belated contention that this was a plain view case. The judge stated:
I don't believe a word the detective [Levenson] said about plain view. I find his testimony to be incredible, unbelievable and the case is not going to be decided on this issue of plain view because there is no fact of plain view because I don't believe it....
The judge relied heavily on the fact that the official police reports of the incident did not mention that the drugs were in plain view. Also, the assistant prosecutor's comment that it was McKoy, a co-defendant, who alerted him to the plain view *412 theory was disregarded by the judge because McKoy did not testify. Based on our careful study of the record, we find sufficient credible evidence to support the finding that the plain view testimony was incredible. State v. Johnson, 42 N.J. 146, 163 (1964).
In this appeal, the State does not contend that this is a plain view case. The State contends only that the search of McKoy's automobile was incident to his lawful arrest and that it is valid under New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Barksdale and A.N.W. argue that the search was not incident to the arrest of McKoy.
It is now well established that a warrantless search is presumed to be invalid. State v. Bruzzese, 94 N.J. 210, 218 (1983), cert. den. 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). The burden is upon the State to prove the validity of a warrantless search. The State was required to establish the validity of the warrantless search by a preponderance of the evidence. State v. Patino, 83 N.J. 1, 13 (1980); State v. Whittington, 142 N.J. Super. 45, 51-52 (App.Div. 1976).
In New York v. Belton, supra, a state trooper stopped a motor vehicle for speeding. Belton was one of four occupants. While the trooper was standing beside the vehicle waiting for the driver's credentials, he smelled burnt marijuana and observed on the floor of the car an envelope that appeared to contain marijuana. The trooper patted down each occupant, and separated them. After examining the envelope, each suspect was given warnings pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); each was searched. The trooper then searched the passenger compartment of the car. On the back seat of the car, a leather jacket belonging to Belton was found. Cocaine was found in one of the pockets of the jacket. The trooper had no backup assistance at the time of the search.
Belton, as well as the present case, deal with the question of when is a search of a motor vehicle permitted as incident to the *413 arrest of its occupants when the occupants are no longer inside the vehicle. Belton reemphasized what the Court had said in Chimel v. California, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039-2040, 23 L.Ed.2d 685 (1969), and Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) that "`[t]he scope of [a] search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible.'" Belton, supra, 453 U.S. at 457, 101 S.Ct. at 2862-2863, 69 L.Ed.2d at 773.
The Belton Court stated:
But no straightforward rule has emerged from the litigated cases respecting the question involved here  the question of the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants....
When a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority. While the Chimel case established that a search incident to an arrest may not stray beyond the area within the immediate control of the arrestee, courts have found no workable definition of `the area within the immediate control of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its recent occupant. Our reading of the cases suggests the generalization that articles inside the relatively narrow compass of an automobile are in fact generally, even if not inevitably, within `the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].' Chimel, 395 U.S. at 763, 23 L.Ed.2d 685, 89 S.Ct. 2034 [at 2040]. In order to establish the workable rule this category of cases requires, we read Chimel's definition of the limits of the area that may be searched in light of that generalization. Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. [453 U.S. at 459-460, 101 S.Ct. at 2863-2864, 69 L.Ed.2d at 774-775; footnotes omitted; emphasis added].
It therefore becomes apparent that Belton requires the search of the passenger compartment of a motor vehicle as an incident to a lawful arrest of the occupants to be contemporaneous with the arrest; the scope of the search is limited to "the area into which an arrestee might reach in order to grab a weapon or evidentiary item." Chimel, supra, 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. Belton does not alter the underlying rationale for this type of search; it establishes a *414 bright line rule which extends the area to be searched to encompass the entire passenger compartment of a motor vehicle including closed containers within the passenger compartment.
The recent case of United States v. Vasey, 834 F.2d 782 (9th Cir.1987) is similar to the present case. There, the Court held that a search of a motor vehicle 30 to 45 minutes after the arrestee had been handcuffed and placed into a patrol car was not permitted by Belton because the area searched was not within Vasey's immediate control. In addition, the Court held that the search was not conducted contemporaneously with the arrest. The reasoning of the Court is applicable to the present case and is worth repeating.
This court is mindful of the fact that officers should not be forced to make difficult legal decisions during the often-volatile circumstances of an arrest. If the Chimel/Belton doctrine is read too strictly, officers will be wary of conducting searches incident to an arrest at the risk of endangering themselves and others. It was upon this consideration that several courts have held that a search of an automobile may be conducted as a search incident to arrest even when the arrestee has been taken from a vehicle and handcuffed. United States v. McCrady, 774 F.2d 868, 871-72 (8th Cir.1985); United States v. Cotton, 751 F.2d 1146, 1149 (10th Cir.1985); United States v. Abel, 707 F.2d 1013, 1015, n. 3 (9th Cir.1983), rev'd on other grounds, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). These cases are distinguishable, however, because the searches in these cases followed closely on the heels of the arrest.

In this case, the search took place anywhere from thirty to forty-five minutes after Vasey had been arrested, handcuffed, and placed in the rear of the police vehicle. The officers conducted several conversations with Vasey while he was in the police vehicle. They exhibited no fear nor testified to any fear that Vasey would try to get out of the police vehicle to grab a weapon or evidence. In fact, the officers attempted to justify their search as an inventory conducted in accordance with local police procedure, not as a search incident to arrest. During the thirty to forty-five minutes that elapsed between the arrest and the warrantless search, the Belton Court's fear of forcing officers to make split second legal decisions during the course of an arrest evaporated and took with it the right of the officers to enter the vehicle under the guise of a search incident to arrest. Simply because the officers had the right to enter the vehicle during or immediately after the arrest, a continuing right was not established to enter the vehicle without a warrant. We do not hold that once an arrestee is handcuffed, all rights to search the vehicle vanish. Rather, the circumstances of the arrest dictate whether the search was proper and conducted contemporaneously with the arrest.

*415 At oral argument, the government argued that under Belton's bright line rule, a search of a vehicle is proper as a search incident to arrest if the arrestee is still at the arrest site. We do not find such a rule in Belton. The Belton Court explicitly admonished that the search had to be conducted contemporaneously with the arrest. The government, in effect, asks us to transform the search incident to arrest exception into a search following arrest exception. This we decline to do. [834 F.2d at 787-788] [Emphasis added].
To the same effect, see United States v. Musick, 534 F.Supp 954, 963 (N.D.Cal. 1982).
Based on our reading of Belton, we agree with the Law Division judge that the search of McKoy's car was not incident to his arrest. First, it was anything but "a contemporaneous incident of that arrest." The search occurred, from all indications, more than 10 minutes after the arrest. After McKoy's arrest, the car was pushed manually for 75 feet and the search occurred four or five minutes after the car had been pushed. Second, McKoy was arrested for driving while on the revoked list. Given the nature of that violation, there simply was no evidentiary items for which to search. Third, it defies common sense in this case to search for weapons 10 minutes after an arrest when four occupants had been in or in close proximity to the car for that entire 10 minutes after the law enforcement officials arrived on the scene. As the judge pointed out, the conduct and the testimony of the law enforcement officials contradicted any notion that they thought McKoy or either passenger was armed and dangerous. In these circumstances, there was no reasonable belief that any occupant of the vehicle was armed and dangerous. See State in the Interest of H.B., 139 N.J. Super. 463, 467 (App.Div. 1976), aff'd 75 N.J. 243 (1977).
Furthermore, as was stated in State v. Welsh, 84 N.J. 346, 355 (1980) at the time of the search McKoy was handcuffed and placed in the back seat of a patrol car that was two or three car lengths behind his vehicle. Chimel does not permit police officers to presume that an arrestee is superhuman. See also United States v. Calandrella, 605 F.2d 236, 249 (6th Cir.1979), cert den. sub nom. Kaye v. United States, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). Once law enforcement officers *416 have secured an arrestee and there is no longer any danger that the arrestee "might gain access to ... a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." United States v. Chadwick, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977).
In the circumstances of this case, there was virtually no chance that McKoy would have returned to the vehicle for a weapon especially since the police officers did not have as much as a hunch that McKoy was armed and dangerous. We hold that the search was not properly limited to the area within McKoy's immediate control. The cases relied upon by the State do not support its position which seeks to transform the search incident to arrest exception into a search following arrest exception. As the Law Division judge indicated, this is a case involving the implementation of the unconstitutional policy of searching every motor vehicle that is stopped. The courts simply cannot lend their imprimatur to this blatant disregard for the State and federal constitutions. See State v. Novembrino, 200 N.J. Super. 229, 244 (App.Div. 1985), aff'd 105 N.J. 95 (1987).
The State further argues that the Family Part Judge should not have adopted in essence the suppression order of the Law Division by applying collateral estoppel. We disagree. This was a perfect case to apply estoppel since the facts controlling both motions were identical and both sought suppression of the same evidence seized. In the circumstances, collateral estoppel was applied properly. State v. Gonzalez, supra, 75 N.J. at 194.
We agree with the State that the Family Part judge should not have dismissed the complaint involuntarily after granting the suppression motion. A.N.W.'s contention that double jeopardy principles preclude reinstatement of the complaint lacks merit. Our careful study of the record convinces us that the dismissal was procedural only because trial on the complaint never commenced. All of the evidence taken on June *417 29, 1987 related exclusively to the suppression motion. Hence, double jeopardy is not implicated.
The orders suppressing the evidence are affirmed. Dismissal of Complaint FJ20-94519-87W is reversed and the complaint is reinstated.