863 A.2d 1044 (2004)
374 N.J. Super. 91
STATE of New Jersey, Plaintiff-Respondent,
v.
William ECKEL, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted on October 18, 2004.
Decided December 29, 2004.
Yvonne Smith Segars, Public Defender, attorney for appellant (Gilbert G. Miller, Designated Counsel, of counsel, and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Steven J. Zweig, *1045 Deputy Attorney General, of counsel, and on the brief).
Before Judges CUFF, WEISSBARD and HOENS.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Defendant, William Eckel, appeals from his conviction, after a guilty plea, of third degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5a(1), -5b(3). After his motion to suppress was denied, defendant entered a negotiated guilty plea. See R. 3:5-7(d). Pursuant to the terms of a plea agreement, defendant was sentenced to three years probation conditioned on serving 180 days in the county jail on weekends. Defendant was also required to earn his high school equivalency diploma while on probation and complete an outpatient drug and alcohol treatment program. Appropriate penalties were also imposed, as well as a six-month driver's license suspension.
In this appeal, defendant challenges the validity of a search, which led to discovery of the drugs forming the basis of his conviction. We conclude that the search was illegal and therefore reverse.
We set out the facts developed at the suppression motion hearing. In doing so we note that the motion judge found the State's witness, Patrolman Douglas Whitten of the Lower Township Police Department, to be credible. The judge's determination in that regard, based on hearing and observing the officer in person, is binding on us. State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999).
On June 30, 2002, at about 3:20 p.m., Whitten, a nine-year veteran of the Department, was in his patrol car in the area of defendant's residence on Seashore Road responding to a report of a stolen vehicle. The vehicle was described as a green Mercury Cougar. Mr. and Mrs. Sanfillipo had reported that the vehicle had been stolen by their daughter, Dana, earlier in the day, and that defendant, the daughter's boyfriend, might also be in the vehicle. Whitten also knew that Upper Township had issued an active warrant for defendant's arrest based on defendant's failure to appear for court dates. At the time, Whitten was not aware of the underlying charge, which led to the failure-to-appear warrant.[1]
Whitten waited across the street from defendant's residence and observed a green Mercury Cougar pulling out of the driveway. A young woman, later identified as Dana Sanfillipo, was driving the vehicle and defendant was sitting in the front passenger seat. In addition to Sanfillipo and defendant, a juvenile male was seated in the rear passenger seat. After waiting for the vehicle to pull onto Seashore Road and head southbound, Whitten conducted a motor vehicle stop of the vehicle. Sergeant Jack Beers assisted Whitten on the stop.
Whitten approached the driver's side and asked Sanfillipo for her driver's license, as well as the registration and insurance card for the vehicle, while Beers asked defendant to exit the vehicle on the passenger side. At that point, defendant was arrested on the outstanding warrant and handcuffed. It took Beers a couple of minutes to arrest defendant and place him in the rear seat of Whitten's patrol car, which was parked behind the Mercury Cougar.
After defendant was placed in the patrol car, Whitten asked Sanfillipo to exit the vehicle and go to the back of the car so that he could speak to her off the side of *1046 the road. During the course of Whitten's conversation with Sanfillipo, which took place at the back of the Mercury and consumed less than five minutes, Sanfillipo asked to give defendant a kiss. Sanfillipo also asked if she could retrieve defendant's clothing out of the vehicle, but Whitten told her to stay where she was and that he would get it. Whitten would not let Sanfillipo enter the vehicle to get defendant's clothes because allowing her to do so could jeopardize the officers' safety. As Whitten went to retrieve defendant's clothing from the front passenger seat area, and throughout the search that ensued, the juvenile remained in the back seat of the car.
Whitten went to the front passenger side of the vehicle, where the door was still open, and picked up defendant's clothes, which were lying on the floorboard in front of the passenger seat. Underneath the clothing was a New Jersey Bell or Verizon phone book, and lying on top of that was "some green vegetation and stems" that Whitten believed to be marijuana. In the course of his nine years of experience, Whitten had seen marijuana before. Aside from the vegetation, Whitten also spotted an opened box of "Philly" blunt cigars on the rear passenger floor in front of the rear occupant, which contributed to his belief that the vegetation on the phone book was marijuana.
After making these observations, Whitten retrieved a pair of blue denim shorts that were located behind the front passenger seat. A softball-sized baggie was rolled up inside the shorts. Inside this bag was an additional baggie, and inside of that were several different items, including a clear plastic baggie with a white powdery substance inside, a small electronic scale with a tray that had some white residue on it, and several different types of small, glassine baggies. Based on his training and experience, Whitten suspected that the white powdery substance was cocaine.
Whitten then asked the juvenile to step out of the vehicle and continued to search the passenger compartment. Whitten discovered a larger baggie with green vegetation in it, which he suspected to be marijuana, wedged in between one of the rear seats and the door. Both Sanfillipo and the juvenile passenger denied ownership of the suspected cocaine and marijuana found in the car. Sanfillipo told Whitten that the shorts might belong to her brother, who occasionally used the car.
After gathering the evidence, Whitten charged all the occupants with CDS-possession-related offenses. Whitten did not charge anyone in relation to the stolen vehicle report, because Sanfillipo's parents  who arrived at the scene after Whitten had searched the vehicle and seized the contraband  told him they were content with getting their car back and did not want to press charges.
We begin with the settled rule that
any warrantless search is prima facie invalid and gains validity only if it comes within one of the specific exceptions created by the Supreme Court. The requirement that a search warrant be obtained before evidence may be seized is not lightly to be dispensed with, and the burden is on the State, as the party seeking to validate a warrantless search, to bring it within one of those recognized exceptions.
[State v. Alston, 88 N.J. 211, 230, 440 A.2d 1311 (1981) (citations omitted).]
In this case, defendant addresses a number of search exceptions in his brief,[2] but *1047 the State defends only on the basis of the search incident to arrest exception, to which we now turn.
That doctrine saw its modern genesis in Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694 (1969), in which the United States Supreme Court held that when an arrest is made, the arresting officer has the right to search not only the person arrested but "the area into which an arrestee might reach in order to grab a weapon or evidentiary items...." Id. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. The permitted area of search thus includes the area within the arrestee's "`immediate control'  construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Ibid. As we said in State v. Rose, 357 N.J.Super. 100, 104, 813 A.2d 1279 (App.Div.), certif. denied, 176 N.J. 429, 824 A.2d 158 (2003), "a search incident to a valid arrest must be limited to the person arrested and the areas within his reach or [grabbable] area." While the rule as originally stated may have seemed clear, its application to a variety of circumstances was not, particularly where the individual arrested was in an automobile. See 3 Wayne R. LaFave, Search and Seizure, § 7.1(a) (3d ed.1996). As a result, seeking to establish a bright-line rule to guide police officers, the Supreme Court extended Chimel beyond its apparent stated purpose and held that when the police have "made a lawful custodial arrest of the occupant of an automobile, [they] may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" as well as "the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981).
Prior to Belton, our Court had rejected the search of the passenger compartment of an automobile as incident to an arrest for illegal gambling on the basis that the area searched was not within the "immediate control" of the arrestee, who was handcuffed in the patrol car. State v. Welsh, 84 N.J. 346, 350, 354-55, 419 A.2d 1123 (1980). In Alston, supra, 88 N.J. at 235 n. 15, 440 A.2d 1311, the Court noted that the outcome in Welsh would likely not be the same under the rationale of Belton, which had just been recently decided. However, finding that the search in Alston could be sustained under the automobile exception, the Court left "to future consideration the question of the continued viability of our analysis of the scope of the Chimel exception as expressed in Welsh." Ibid.
It was not until State v. Pierce, 136 N.J. 184, 642 A.2d 947 (1994), that the Court finally addressed Belton in a comprehensive manner, in the context of a search of the passenger compartment of a vehicle following the arrest of the driver for operating the vehicle with a suspended license. After tracing the evolution of the search incident to arrest exception from dictum in Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652, 655 (1914), to Belton, the Court took note of widespread scholarly criticism of Belton, as well as a minority of state court decisions from other jurisdictions rejecting or modifying the Belton rule under state constitutional provisions. Pierce, supra, 136 N.J. at 196-203, 642 A.2d 947. Applying the greater protection afforded by our *1048 State Constitution against unreasonable searches and seizures, id. at 208-09, 642 A.2d 947, the Court rejected Belton"insofar as it purports to authorize vehicular searches indiscriminately based only on contemporaneous arrests for motor-vehicle violations." Id. at 209-10, 642 A.2d 947. As a result, the Court saw no need to address the broader applicability of Belton under our State Constitution, noting that "the issue is significant enough to warrant additional briefing and argument." Id. at 208, 642 A.2d 947.
In a concurring opinion, Justice Handler, speaking for Justice Garibaldi and himself, expressed the view that "[b]ecause Belton applies Chimel, and does not purport to alter Chimel, it in no way obviates the requirement that the searched area actually be within the immediate control of the arrestee." Id. at 218, 642 A.2d 947 (Handler, J., concurring). The evidence in Pierce, he said, "suggests that the search occurred after the arrest of the driver had been completed by his physical restraint and actual removal to the patrol car and, therefore, was not contemporaneous with the arrest of the driver, and that the area searched, the van, was no longer within the physical control of the arrestee." Ibid. Being "persuaded by the Belton Court's stated intention not to alter Chimel that the concept of control must still have real meaning and be applied in light of surrounding circumstances," id. at 219, 642 A.2d 947, Justice Handler found the Pierce search "invalid, under both Belton and Chimel, for the straightforward and narrow reason that it was not a `contemporaneous' incident of the arrest and the passenger compartment was no longer within the `immediate control' of [the driver] once he had been physically restrained and removed and placed in the patrol car." Id. at 223, 642 A.2d 947.
Other than being a bright-line rule, the Belton extension of Chimel has little to commend it. LaFave, supra, § 7.1(c). It is difficult to fathom how a search of a vehicle's interior can be justified on the ground that it is within the area into which an arrestee might reach for weapons or to hide or destroy evidence, when the person arrested is out of the vehicle and securely under police control.[3]
Indeed, a number of Supreme Court Justices have recently expressed varying degrees of misgiving about the Belton rule. In Thornton v. United States, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004), a police officer made the determination to pull over defendant's car based on information that the license tags did not match the vehicle to which they were affixed. Id. at ___, 124 S.Ct. at 2129, 158 L.Ed.2d at 911. However, as the patrol car pulled in behind him, but before the officer could effectuate a stop, defendant pulled into a parking lot and left his car. Ibid. The officer detained, questioned and patted down Thornton, revealing drugs for which he was arrested and placed in the patrol car. Ibid. A subsequent search of the car revealed a gun. Ibid. The Supreme Court concluded that the arrest of a "recent occupant" of an automobile permits the type of search authorized by Belton, stating:
To be sure, not all contraband in the passenger compartment is likely to be readily accessible to a "recent occupant." It is unlikely in this case that petitioner could have reached under the driver's seat for his gun once he was outside of his automobile. But the firearm and the passenger compartment in general were no more inaccessible than were the contraband *1049 and the passenger compartment in Belton. The need for a clear rule, readily understood by police officers and not depending on differing estimates of what items were or were not within reach of an arrestee at any particular moment, justifies the sort of generalization which Belton enunciated. Once an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment.
[Id. at ___, 124 S.Ct. at 2132, 158 L.Ed.2d at 914.]
Justices Scalia and Ginsburg, concurring, expressed what could only be charitably described as extreme reservations about the Belton rule.
The popularity of the practice [of securing arrestees before searching the car] is not hard to fathom. If Belton entitles an officer to search a vehicle upon arresting the driver despite having taken measures that eliminate any danger, what rational officer would not take those measures? Cf. Moskovitz, A Rule in Search of a Reason: An Empirical Reexamination of Chimel and Belton, 2002 Wis. L.Rev. 657, 665-666 (citing police training materials). If it was ever true that the passenger compartment is "in fact generally, even if not inevitably," within the arrestee's immediate control at the time of the search, 453 U.S. at 460, 101 S.Ct. 2860, it certainly is not true today. As one judge has put it: "[I]n our search for clarity, we have now abandoned our constitutional moorings and floated to a place where the law approves of purely exploratory searches of vehicles during which officers with no definite objective or reason for the search are allowed to rummage around in a car to see what they might find." [United States v.] McLaughlin, [170 F.3d 889,] 894 [(9th Cir.1999)](Trott, J., concurring).
[Thornton, supra, 541 U.S. at ___, 124 S.Ct. at 2135, 158 L.Ed.2d at 918 (Scalia, J., concurring).]
Urging the Supreme Court to "be honest" about the basis for following Belton, Justice Scalia noted that,

Belton cannot reasonably be explained as a mere application of Chimel. Rather, it is a return to the broader sort of search incident to arrest that we allowed before Chimel  limited, of course, to searches of motor vehicles, a category of "effects" which give rise to a reduced expectation of privacy, see Wyoming v. Houghton, 526 U.S. 295, 303, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), and heightened law enforcement needs, see id. at 304, 119 S.Ct. 1297, 143 L.Ed.2d 408; [United States v.] Rabinowitz, 339 U.S. [56,] 73, 70 S.Ct. 430, 94 L.Ed. 653 (Frankfurter, J., dissenting).
[Thornton, supra, 541 U.S. at ___, 124 S.Ct. at 2137, 158 L.Ed.2d at 919-20.]
As a result, the two justices would "limit Belton searches to cases where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Ibid. The majority, however, declined Justice Scalia's invitation to re-examine Belton since the issue had not been directly raised in the certiorari petition nor had it been considered by the court below. Id. at ___ n. 4, 124 S.Ct. at 2132 n. 4, 158 L.Ed.2d at 915 n. 4. Justice O'Connor, also concurring, took note of "Belton's shaky foundation." Thornton, supra, 541 U.S. at ___, 124 S.Ct. at 2133, 158 L.Ed.2d at 915. (O'Connor, J., concurring).
Finally, Justices Stevens and Souter dissented on the ground that the United States Supreme Court was unwisely extending Belton beyond "the narrow class of cases it was designed to address ... without supplying any guidance for the future application of its swollen rule." Id. at ___, 124 S.Ct. at 2140, 158 L.Ed.2d at 923. (Stevens, J., dissenting).
*1050 We conclude that unless and until our Supreme Court definitively decides otherwise,[4]Belton does not represent the law in New Jersey under the greater protections provided by our State Constitution, see Pierce, supra, 136 N.J. at 209, 642 A.2d 947, and we decline to follow it.[5] Accordingly, the search in question must be judged under Chimel. Sine defendant was already in custody in the rear of the patrol car before the vehicle search took place, the interior of the vehicle was not within his "grabbable" area and, therefore, not under his control. See Pierce, supra, 136 N.J. at 218-20, 642 A.2d 947 (Handler, J., concurring). As a result, defendant's motion to suppress should have been granted.
In light of our disposition, we have no occasion to consider defendant's sentencing argument.
Reversed and remanded for further proceedings.
NOTES
[1] The State stipulated at the suppression hearing that the warrant for failing to appear was based on $280 in unpaid traffic tickets.
[2] Defendant argues that this search is invalid under the warrant exceptions for consent and community caretaking, as well as the automobile exception. Defendant also argues that he had standing to contest the search and a reasonable expectation of privacy in the contents of the vehicle. In its brief, the State makes clear that it does not contest defendant's standing, finds it unnecessary to address the community caretaking and automobile exceptions, and "never argued below, and is not suggesting on appeal that the police entry was pursuant to a consent to search."
[3] In United States v. Johnson, 16 F.3d 69, 71-73 (5th Cir.1994), decision clarified on reh'g, 18 F.3d 293 (5th Cir.1994), the court declined the government's request to extend Belton to a search of a suspect's office incident to arrest. The court limited such a search to the original Chimel rationale, i.e., the area within the arrestee's immediate control.
[4] We are not unmindful of State v. Goodwin, 173 N.J. 583, 803 A.2d 102 (2002), a decision not cited by the State in its brief on this appeal. Goodwin is indeed a post-Pierce opinion that relies upon Belton to uphold a search incident to arrest. Id. at 598-99, 803 A.2d 102. However, the search discussion in Goodwin is clearly dictum since the Court had already decided that defendant's post-conviction relief petition, in which the validity of the search had been challenged as part of an ineffective assistance of counsel claim, was untimely. Id. at 593-96, 803 A.2d 102. Most importantly, Goodwin never analyzed Belton and never mentioned Pierce. We simply cannot conclude that the Court intended to decide sub silentio such an important issue, previously reserved in Pierce.
[5] The most recent decision by a sister state disavowing Belton under its own state constitution appears to be Commonwealth v. White, 543 Pa. 45, 669 A.2d 896, 901-02 (1995). In his concurring opinion, Justice Montemurro catalogued the "vast majority of states" that have adopted the Belton reasoning but also noted that only five states had actually "engaged in an independent state constitutional analysis." Id. at 905-06. Of these, Justice Montemurro cited Pierce as the only case that had engaged "in any meaningful analysis under its state constitution" and he found Pierce's criticism of the Belton rule "well reasoned." Id. at 907. Justice Montemurro also referred to the scholarly criticism of Belton, id. at 907-08, and concluded "that the Belton rule is seriously flawed and has no place in Pennsylvania jurisprudence." Id. at 908. In Vasquez v. State, 990 P.2d 476, 483 n. 3 (Wyo.1999), the Supreme Court of Wyoming, in following Belton under the Wyoming Constitution, catalogued the cases that have accepted and rejected Belton. To this may be added State v. Murrell, 94 Ohio St.3d 489, 764 N.E.2d 986 (2002), in which the Supreme Court of Ohio opted to follow Belton, overruling its earlier opinion in State v. Brown, 63 Ohio St.3d 349, 588 N.E.2d 113, cert. denied, 506 U.S. 862, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992). In a dissenting opinion joined by one other justice, Chief Justice Moyer, pointed out again how "in applying Chimel to Belton, the [Supreme Court] stretched the underlying justification supporting Chimel beyond its rationale." Murrell, supra, 764 N.E.2d at 994 (Moyer, C.J., dissenting). Even more recently, Nevada stated its adherence to prior case law rejecting Belton. Camacho v. State, 119 Nev. 395, 75 P.3d 370, 373-74 (2003), reh'g denied, (Oct. 23, 2003), reconsideration en banc denied, (December 17, 2003).