151 N.J. Super. 138 (1977)
376 A.2d 596
STATE OF NEW JERSEY, PLAINTIFF,
v.
JAMES V. CARANGELO, PAUL A. NESE, JR., MICHAEL H. NEWELL, JOSEPH P. PASZEK, RONALD A. SEVERINI, DONALD J. O'HARE, A.J. PAGANO, ALBERT P. SCALIA, HELEN SCALIA, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal).
Decided February 28, 1977.
*141 Mr. John Conaghan for defendant James V. Carangelo (Messrs. Conaghan & Conaghan, attorneys).
Mr. Thomas DeClemente for defendants Paul A. Nese, Jr., Michael H. Newell, Joseph P. Paszek and Ronald A. Severini (Messrs. Lewis & DeClemente, attorneys).
Mr. James Galdieri for defendant Donald J. O'Hare (Messrs. Krivit, Miller & Galdieri, attorneys).
Mr. John Dwyer for defendant A.J. Pagano (Mr. Kenneth R. Claudat, attorney).
*142 Mr. Joseph Gallagher for defendants Albert P. Scalia and Helen Scalia (Mr. Samuel R. DeLuca, attorney).
Mr. William Z. Shulman for the State (James T. O'Halloran, Prosecutor of Hudson County, attorney).
CALISSI, J.S.C.
The Hudson County grand jury returned Indictment 503 of the 1973 term charging 14 defendants with Conspiracy to violate the gambling laws of the State of New Jersey as well as the violation of substantive provisions of N.J.S.A. 2A:121-3.[1]
Defendant O'Hare, a patron at the Hotsy Totsy tavern in Jersey City, was arrested on October 16, 1973 during a raid conducted by the members of the Jersey City and Bayonne Police Departments, pursuant to the execution of *143 a search warrant. O'Hare duly filed within time, R. 3: 5-7, a motion to suppress evidence  football lottery slips  seized from his person and found in a brown paper bag on the floor area adjacent to him. He contended that the warrant authorizing the search of the tavern and any person present was a general warrant, in violation of the mandate of the Fourth Amendment and N.J. Const. (1947), Art. I, par. 7, and the recent holding of State v. Riggins, 138 N.J. Super. 497 (Law Div. 1976).
Defendants Newell, Paszek, Severini and Carangelo, although not filing motions to suppress within the time set forth in R. 3:5-7, were permitted to join in the argument, good cause having been shown for the delay. They contended that the warrantless searches of their respective motor vehicles were unreasonable and illegal in violation of their constitutional rights.
Albert Scalia and Helen Scalia, in support of their duly filed motion to suppress the evidence, contended that the search warrant for the premises of the Hotsy Totsy Club was not executed within the time specified in the warrant, i.e., between 7 and 10 P.M., and for that reason it was without legal force or effect.
Defendant Pagano claimed that the warrant authorizing the search of his dwelling at 96 Evergreen Street, Bayonne, N.J., was executed 54 minutes after the time therein specified and for that reason the evidence recovered should be suppressed.
Detective John Cassidy, Patrolman John McDonald and Sergeant Edward Bennett, members of the Jersey City Police Department, testified on behalf of the State. The evidence described a gambling investigation conducted over a period of 1 1/2 months in a joint effort by Jersey City and Bayonne police officials, which investigation culminated in the arrests of the defendants.
Detective Cassidy and a member of the Bayonne Police Department were strategically stationed on the roof of a three-story building across the street from the Hotsy Totsy *144 where, with the aid of binoculars, they were able to observe persons entering and leaving the tavern. During the period of roof surveillance which began at 7:30 P.M., and continued until about 12:30 A.M. on October 16, 1973, an undercover Bayonne police officer was operating inside the tavern. The officers on the roof had been informed by the Bayonne police officer, working incognito, how the illegal football lottery slips would be taken from the Hotsy Totsy in brown paper packages.
At 9:45 P.M. Detective Cassidy was informed by radio communication of the arrest of Carl Nese whom Cassidy had earlier observed leaving the tavern carrying a brown paper package. Nese's automobile had been spotted in prior surveillances and a search warrant had been obtained for it. The arresting officers notified Cassidy that the package found in Nese's car contained illegal football slips. At about 9:50 P.M. James Carangelo and Joseph Paszek were seen exiting the tavern, carrying what looked like a brown paper package. The undercover officer, a few steps behind, took out a white handkerchief and as per a prearranged signal placed it on his nose. That gesture indicated that the brown paper package being carried out of the tavern contained illegal football lottery slips. Carangelo and Paszek proceeded to an automobile which both entered. Carangelo drove. By two-way radio the information was relayed to the officers in a police car which was standing by as part of the investigation. The Carangelo car was stopped and searched. Three hundred and eighty-eight football lottery slips in the brown paper package were found in the vehicle.
Defendant Ronald Severini left the Hotsy Totsy tavern at approximately 9:55 P.M., a short time after defendants Carangelo and Paszek. Severini, too, was observed by Detective Cassidy carrying a brown wrapped paper package similar to the one carried by Carangelo. Severini proceeded to his motor vehicle. That information was relayed to the officers in the stand-by police vehicle. They stopped Severini and in open view on the front seat of the automobile the *145 police officers noticed the wrapped paper package. It contained 270 football lottery slips. One hundred ninety one dollars in cash was also confiscated.
At 11:50 P.M. defendant Newell exited the Hotsy Totsy transporting a wrapped paper package similar to those carried out by the others who had earlier been arrested and found to be in possession of illegal football lottery slips. Cassidy saw Newell place the package in a motor vehicle and then proceed to enter it and drive away. That information was also conveyed to the stand-by police, who in turn stopped Newell's car. A brown paper package was found on the front seat, which package contained 706 football lottery slips.
On cross-examination defense counsel sought to establish by the size and shape of the brown and wrapped paper packages that they very well could have been six-packs of beer and that the police officers not knowing the contents thereof at the time of initial observation were without any probable cause to suspect that the packages contained lottery slips. Although the officers were unable to describe the packages with precision, it is clear from their testimony that the packages were distinctively different in size and shape from that of a six-pack of beer. Incidentally, no packages of beer were found that night in the possession of defendants or in their motor vehicles.
It hardly needs repeating that the Fourth Amendment and Art. I, par. 7 of the New Jersey Constitution prohibit only unreasonable searches and seizures. Whether a warrantless search is unreasonable depends on the circumstances of the particular situation. While a consideration of the various factors separately may be insufficient to constitute probable cause for a search, by a combination of all the factors the test may be met. State v. Contursi, 44 N.J. 422 (1965). In analyzing the circumstances the specialized experience and knowledge of policemen must be taken into account by the court. While it has been stated that there is no mathematical exactness to the concept of probable cause, *146 the test is whether under the circumstances presented a prudent man would be warranted in the belief that a crime has been or probably is being committed. State v. Mark, 46 N.J. 262 (1966).
The facts and circumstances within the officers knowledge in the instant case were sufficient to warrant a man of reasonable caution in the belief that a crime had been or was being committed. See Carroll v. United States, 267 U.S. 132, 162; 45 S.Ct. 280, 69 L.Ed. 543 (1925), 39 A.L.R. 790. The fact that search warrants had been issued for the search of certain premises and motor vehicles, which warrants did not specifically mention all the defendants, is of no legal significance. If, during the course of an investigation, surveillance or search pursuant to a warrant, facts and circumstances are made known to or are observed by law enforcement officers which involve actions by others who were not named in the search warrant and those actions and circumstances warrant a reasonable, prudent person to believe that a crime was being committed or had been committed, the officers not only have the right but also the duty to search such persons. Here, the first arrest was that of defendant Nese at 9:45 P.M. He was seen carrying a brown package and upon the search made of his car lottery slips were discovered. With this information relayed to the rooftop team, confirmation was had of the modus operandi. It was of no moment, therefore, that no warrants existed to search and arrest other individuals seen leaving the tavern carrying brown wrapped packages. Time would not have permitted the obtaining of additional warrants. Under the circumstances the police had probable cause then and there to relay the information to stand-by units to stop and search those automobiles and occupants.
Sgt. Edward Bennett was amongst those executing the search warrant at the Hotsy Totsy Club at about 12:30-12:45 A.M. on October 16, 1973. Upon entering the tavern he observed defendant Donald O'Hare at his right at the end of the bar. Alongside of him there was a brown paper bag *147 which Bennett observed O'Hare quickly discard and throw to the floor next to him. Bennett approached O'Hare and retrieved the bag, which was unsealed and open. The officer, upon looking inside, saw that it contained football lottery slips. He placed O'Hare under arrest. The ensuing search of O'Hare revealed in his shirt pocket a single slip containing a winning football lottery bet and a $20 bill attached to it. Before the seizure of the bag and the arrest of O'Hare, Sgt. Bennett had information regarding prior arrests of patrons from the Hotsy Totsy bar who had in their possession brown paper packages containing football lottery slips. That, coupled with the furtive act of O'Hare in quickly disposing of the brown paper package next to him on the bar, constituted more than naked suspicion. It was a well-grounded suspicion, sufficient to meet the test of probable cause properly giving rise to reasonable search. State v. Waltz, 61 N.J. 83 (1972); State v. Mark, supra. Sgt. Bennett, under the circumstances, had probable cause to suspect that the bag contained illegal football lottery slips. He, therefore, had the right to seize the bag, note its contents, arrest defendant and search him.
When Sgt. Bennett made the observation he was legally in the public tavern, under authority of the search warrant and by reason of the establishment being a "licensed premises." See N.J.S.A. 33:1-1(k), 33:1-35, 33:1-39.[2]
The search warrant for the Pagano residence at 96 Evergreen Street in the City of Bayonne specified the time of between 6 P.M. and 2 A.M. for its execution. It was executed at 2:54 A.M. The search warrant for the Hotsy Totsy Club in Jersey City fixed the execution between 7 P.M. and 10 P.M. In point of time, it was executed several hours later, as heretofore stated. Defendants contend that the warrants were "stale" and therefore null and void.
*148 R. 3:5-5 provides that the warrant "must be executed within 10 days after its date during the hours fixed therein by the judge issuing it." There are, however, no rules or New Jersey court decisions which nullify a warrant and render it ineffective if it is executed later in the day or night than fixed in the warrant. One New Jersey decision, which touches only obliquely on the issue presented in this case, is State v. Morley, 5 N.J. Misc. 987, 139 A. 392 (Qtr. Sess. 1927), where the court quashed the search warrant, suppressed the evidence (liquor) and ordered that the contraband seized be returned.
The search warrant in Morley was issued pursuant to a statute which stated that if a search warrant is allowed, "the magistrate must insert a direction therein that it be served in the daytime, unless the affidavits are positive that the property is on the person or in the place to be searched, in which case the magistrate may insert a direction that it be served at any time of the day or night." 5 N.J. Misc. at 988. The magistrate failed to direct that it must be served during the daytime or at any time of the day or night. The court using the language of United States v. Kaplan, 286 F. 963 (D.C. 1923), stated that "the warrant should be full and complete in itself. Both as to essentials and as to direction * * *"
Kaplan concerned itself with the construction of § 10 of the Federal Espionage Act, which was practically identical to the statute being construed in Morley. The search warrant in Kaplan was executed at night, even though it failed to contain authority permitting a nighttime search.
There the court said that "a search and seizure in the nighttime where the warrant does not, in terms, contain direction that it may be served at any time of the day or night are illegal" 286 F. at 971. See State v. Wilson, 25 Ariz. App. 49, 540 P.2d 1268 (1975).
The warrants in the instant case contained no such infirmities. They are full and complete both as to essentials and direction. Unlike the rules or statutes of other jurisdictions *149 which fix the time for execution by the words "forthwith,"[3] "immediate"[4] or "reasonable promptness."[5] Our rule provides for a ten day period. The questioned warrants were in fact executed within that time period. The only question that surfaces is whether the warrants came to a sudden demise at the stroke of the hour stated for their execution.
The fact that a warrant was untimely served does not by that fact alone destroy its vitality. Even an unreasonable delay (not to exceed ten days) will not vitiate a search warrant unless defendant can show absence of probable cause at the time the warrant was executed or legal prejudice to the suspect caused by the delay.[6] See Seymour v. United States, 85 U.S. App. D.C. 366, 177 F.2d 732 (D.C. Cir.1949); Spinelli v. United States, 382 F.2d 871 (8 Cir.1967), rev'd on other grounds 393 U.S. 410, 89 S.Ct. 584, 21 L. *150 Ed.2d 637 (1969); House v. United States, 134 U.S. App. D.C. 10, 411 F.2d 725 (D.C. Cir.1969); United States v. Bradley, 428 F.2d 1013 (5 Cir.1970); United States v. Harper, 450 F.2d 1032 (5 Cir.1971).
More recent decisions have reiterated the principle that the key factor in determining the validity of an untimely executed search warrant is the presence or absence of probable cause at the time of its execution. United States v. Bedford, 519 F. 2d 650 (3 Cir.1975). See United States v. Wilson, 491 F.2d 724 (6 Cir.1974); United States v. Rael, 467 F.2d 333, 336 (10 Cir.1972), cert. den. 410 U.S. 956, 93 S.Ct. 1429, 35 L.Ed.2d 690 (1973); United States v. Nepstead, 424 F.2d 269, 271 (9 Cir.1970) cert. den. 400 U.S. 848, 91 S.Ct. 50, 27 L.Ed.2d 86 (1970); People v. Hernandez, 43 Cal. App.3d 581, 118 Cal. Rptr. 53 (D. Ct. App. 1974); Commonwealth v. Cromer, 365 Mass. 519, 313 N.E.2d 557 (Sup. Jud. Ct. 1974). A defendant charging prejudice by reason of the delayed search must prove some definite legal prejudice which has resulted from the unreasonable delay. The fact that incriminating evidence was discovered in the search is not grounds for complaint. United States v. Nepstead, supra, 424 F.2d 269 (9 Cir.1970).
The question of continued existence of probable cause will, of course, depend on the particular facts of each case. A search warrant should be executed without unreasonable delay within the ten-day period in order to lessen the possibility that probable cause supporting the warrant does not dissipate and thereby render it legally impotent. In that way the officers are given a reasonable latitude to determinate when a warrant should be served within the ten day period and the person with standing has the assurance that the evidence will be suppressed if the search is made absent probable cause. But in this case nothing occurred between the time the warrants were issued and the searches were made to change the facts recited in the affidavits upon which the issuing judge found probable cause. Although not precluded from doing so, defendants offered no proof that by reason of the untimely *151 execution of the warrants the circumstances had changed to the extent that probable cause had dissipated. There was no proof which even remotely demonstrated any legal prejudice to the defendants which could be attributed to the delay. The search warrants are presumed valid. The burden of proof to show the invalidity of the warrants is upon defendants. State v. Kuznitz, 105 N.J. Super. 33 (Cty. Ct. 1969); State v. Gaudiosi, 97 N.J. Super. 565 (App. Div. 1967); State v. Mark, supra, 46 N.J. 262 (1966). It follows that at the time the warrants were served they were valid and subsisting.
For the above stated reasons the motions to suppress the evidence made by defendants are denied.
NOTES
[1] Defendants James Vincent Carangelo, Paul Anthony Nese, Jr., Michael H. Newell, Donald John O'Hare, Anthony Joseph Pagano, Joseph Paul Paszek, Joseph Rivera, Nicholas John Roman, Albert Peter Scalia, Ronald Anthony Severini, Emil Michael Taskas, Frank Mastrella, Nicholas Yannaccone and Helen Scalia were indicted by the Hudson County grand jury, Indictment 503 of the 1973 term charging the violation of the provisions of the gambling laws, namely N.J.S.A. 2A:121-3(a), (b), and (c).

James Vincent Carangelo, Paul Anthony Nese, Jr., Michael H. Newell, Donald John O'Hare, Anthony Joseph Pagano, Joseph Paul Paszek, Joseph Rivera, Nicholas John Roman, Albert Peter Scalia, Ronald Anthony Severini and Emil Michael Taskas were charged in the first count with unlawfully conspiring to violate the criminal laws of New Jersey pertaining to the business of lottery policy, N.J.S.A. 2A:121-3.
Defendants Anthony Joseph Pagano, Albert Peter Scalia, Paul Anthony Nese, Jr., James Vincent Carangelo, Michael H. Newell, Joseph Paul Paszek, Joseph Rivera, Ronald Anthony Severini, Emil Michael Taskas, Donald John O'Hare, Nicholas Romano were charged with working for an illegal lottery, N.J.S.A. 2A:121-3(a), and with possession of papers, documents, slips and memoranda pertaining to the business of lottery policy, N.J.S.A. 2A:121-3(b).
Anthony Joseph Pagano, Helen Scalia, Albert Peter Scalia, Frank Mastrella and Nicholas Yannaccone were charged with maintaining premises where the business of lottery was carried on and knowingly permitting such premises to be so used, N.J.S.A. 2A:121-3(c).
[2] See Regulation No. 20, Rules 7 and 34, promulgated by Commissioner pursuant to N.J.S.A. 33:1-39. Also, N.J.A.C. 13:2-21.7.
[3] R. 41(c) (d) of the Fed. Rules of Crim. Proc. prior to 1972 Amendment (forthwith).
[4] Commonwealth v. Cromer, 365 Mass. 519, 313 N.E.2d 557 (Sup. Jud. Ct. 1974) (immediately)
[5] State v. Ferrigno, 5 Conn. Cir. 468, 256 A.2d 795 (Cir.1969) (reasonable promptness). See United States v. Bedford, 519 F.2d 650 (3 Cir.1975), where court was confronted with search conducted pursuant to a state warrant (Penna.) which directed a "forthwith" execution.
[6] State v. Blaurock, 143 N.J. Super. 476 (App. Div. 1976), was concerned with the staleness of probable cause at the time warrant was issued and not at time of execution. In a per curiam opinion the court adopted the reasoning in United States v. Johnson, 461 F.2d 285 (10 Cir.1972) that the vitality of a search warrant does not depend on the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Where the facts recited show activities of a protracted nature, passage of time is less significant. The court disagreed with the lower tribunal which had reasoned that the probable cause which existed during a time prior to the issuance of the search warrant did not continue and was not present on the date the magistrate issued the warrant. The seminal case on the issue of probable cause raised in State v. Blaurock, supra, is Sgro v. United States, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932), 85 A.L.R. 108.