627 A.2d 125

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. VIVIAN HENRY, DEFENDANT–RESPONDENT.

Argued May 4, 1993—Decided July 19, 1993.

*Deborah Bartolomey,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*William P. Robertson,* Designated Counsel, argued the cause for respondent (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This appeal concerns the validity of a "buy-bust" operation that resulted in the arrest and conviction of defendant on narcotics charges. An undercover police officer was invited into defendant's apartment, where he purchased cocaine. As soon as he left the apartment, he informed his backup team of the "buy," and they moved in for the "bust." They knocked, defendant opened the door, and when they announced themselves as police officers, a co-defendant fled into a back room of the apartment to try to hide contraband. The question before the Court is whether the warrantless arrest and seizure of evidence in defendant's home violated the United States and New Jersey Constitutions.

I

On July 29, 1987, around noon, an informant told Newark detective Ralph Boswell that "crack" cocaine was being sold from apartment 1A at 179 Norfolk Street. He also told Boswell that a man named Terrell and a woman named Vivian lived there, and that Terrell would sell crack to "anybody who wanted to buy it."

Detective Boswell informed the five officers who would act as his backup team that he was going to attempt to make a buy at 179 Norfolk. The backup officers drove to the location and waited in their cars a short distance from the address. Detective Boswell drove separately in an unmarked car and then knocked on the door of apartment 1A.

When defendant, Vivian Henry, opened the door, Detective Boswell said, "Let me get two," and at the same time stepped about two feet into the apartment. Defendant closed the door behind Boswell and responded, "You have to see my son for that." She turned and pointed at Terrell Henry, who was standing in the apartment. Detective Boswell approached Terrell and said, "Give me two." Terrell asked Boswell for twenty dollars. The detective gave Terrell two ten-dollar bills that he had photocopied at the stationhouse earlier. Terrell then told another occupant of the apartment, Sharlene Wright, to "go get him two." When she went into another room to get the crack, Detective Boswell observed that in addition to the three adults involved in the drug sale, at least two other adults and several children were in the front room of the apartment. He could not see into the other rooms to determine whether other people were in the apartment. When Sharlene Wright handed Detective Boswell two vials of crack, he left the apartment.

Once outside, Detective Boswell radioed his backup team and informed them that he had made an undercover buy. He described the location and the three people involved in the sale, and then waited outside while the other officers went in to arrest Vivian Henry, Terrell Henry, and Sharlene Wright.

One of the backup detectives knocked on the door of apartment 1A. Defendant opened it, and the police announced themselves. Their identity, however, had already become apparent. Sharlene Wright, who was standing next to defendant, had recognized them as police as soon as defendant opened the door. She fled into a bedroom, with two of the detectives in pursuit. When they caught her, she was trying to hide a plastic bag containing 116 vials of crack under a mattress.

The backup team arrested Vivian Henry, Terrell Henry, and Sharlene Wright and advised them of their rights. They searched Terrell Henry and retrieved the ten-dollar bills that Detective Boswell had photocopied earlier. Because no female police officers were present, the police did not search Vivian Henry and Sharlene Wright. The officers did not conduct a search of the apartment; nor did they detain the four other adults and the three children in the apartment.

When the backup team brought the three suspects outside, Detective Boswell identified them as the people who had sold him crack a few moments earlier. The suspects were put in the back seats of the police cars and driven to headquarters. When one of the detectives was taking Sharlene Wright out of the car, he saw her drop four vials of crack into the rear of the car. He recovered them and observed that they were identical to the vials Wright had tried to hide in the apartment.

An Essex County grand jury indicted defendant and her two co-defendants, Terrell Henry and Sharlene Wright, on charges of conspiracy to violate the narcotics laws, contrary to *N.J.S.A.* 2C:5–2; possession of a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–10a(1); possession with intent to distribute, contrary to *N.J.S.A.* 2C:35–5b(2); distribution of a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–5b(3); possession with intent to distribute within 1,000 feet of school property, contrary to *N.J.S.A.* 2C:35–7; and distribution within 1,000 feet of school property, contrary to *N.J.S.A.* 2C:35–7. Later, an additional indictment specifically charged defendant with distribution of a

controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–5b(3); and distribution within 1,000 feet of school property, contrary to *N.J.S.A.* 2C:35–7.

All three defendants moved to suppress the two vials of crack that had been sold to Detective Boswell, the ten-dollar bills that he had used to pay for the purchase, the 116 vials of crack that Sharlene Wright had attempted to hide in the bedroom, and the four vials that she had discarded in the back of the police car. The trial court ruled that no search had taken place with respect to the two vials purchased by Detective Boswell, and that the other three items of evidence had been seized incident to a lawful arrest.

Defendant then pled guilty to the conspiracy, possession, and school-zone offenses. In exchange for the plea, the State agreed to waive the mandatory period of parole ineligibility pursuant to *N.J.S.A.* 2C:35–12 and to recommend a three-year prison sentence. The State also agreed to downgrade the conspiracy and distribution charges from second- to third-degree crimes. Defendant was sentenced to three-year prison terms on each charge, all of which were to run concurrently.

Defendant appealed the trial court's denial of her motion to suppress the evidence. The Appellate Division reversed the trial court's ruling, holding that although Detective Boswell's "buy" had created probable cause, the exigent circumstances had been police-created and could not justify a warrantless entry into defendant's home. 255 *N.J.Super.* 593, 605 *A.*2d 1113 (1992). One dissenting judge found the officers' conduct to be objectively reasonable and concluded that even absent exigent circumstances, the entry had complied with the traditional common-law restrictions on entries to arrest. *Id.* at 606, 605 *A.*2d 1113.

The State appealed as of right, pursuant to *Rule* 2:2–1(a)(2).

## II

The Fourth Amendment of the United States Constitution and article I, paragraph 7 of the New Jersey Constitution

protect against unreasonable searches and seizures. A basic principle of Fourth Amendment law is that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 *U.S.* 573, 586, 100 *S.Ct.* 1371, 1380, 63 *L.Ed.*2d 639, 651 (1980). That is a fundamental precept of our own constitution. *State v. Hutchins*, 116 *N.J.* 457, 561 *A.*2d 1142 (1989). The warrant requirement safeguards citizens by placing the determination of probable cause in the hands of a neutral magistrate before an arrest or search is authorized. *See Beck v. Ohio*, 379 *U.S.* 89, 96, 85 *S.Ct.* 223, 228, 13 *L.Ed.*2d 142, 147 (1964). If that safeguard is absent, as it was in this case, the State has the burden of proving the overall reasonableness of the search. *See State v. Bolte*, 115 *N.J.* 579, 585, 560 *A.*2d 644, *cert. denied*, 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989).

*N.J.S.A.* 40A:14–152.1 empowers "any full-time, permanently appointed municipal police officer ... [to] arrest for any crime committed in said officer's presence and committed anywhere within the territorial limits of the State of New Jersey." That statutory authority comports with the common law of arrest, which allowed peace officers to arrest without a warrant if a breach of the peace was committed in their presence. *See State v. Smith*, 37 *N.J.* 481, 494, 181 *A.*2d 761 (1962), *cert. denied*, 374 *U.S.* 835, 83 *S.Ct.* 1879, 10 *L.Ed.*2d 1055 (1963). Under the common law, peace officers also had the authority to arrest without a warrant if they had probable cause to believe that a suspect was committing or had committed a felony, even though it was not committed in the officers' presence. *See State v. Doyle*, 42 *N.J.* 334, 345–46, 200 *A.*2d 606 (1964). An arrest for an offense committed in an officer's presence is presumptively based on probable cause. *See State v. Kenison*, 248 *N.J.Super.* 189, 210, 590 *A.*2d 708 (Law Div.1990), *aff'd*, 248 *N.J.Super.* 126, 590 *A.*2d 677 (App.Div.1991).

Thus, Detective Boswell, having observed the commission of a crime in his presence, had both statutory and common-law authority to arrest defendant on the spot. Defendant contends, however,

that once Detective Boswell left the apartment without making an arrest, he could easily have obtained an arrest warrant and therefore was. constitutionally obligated to do so.

■ It does not follow, however, that an otherwise legal warrantless arrest becomes illegal because a warrant could have been secured. "[I]f the arrest without a warrant is lawful the search and seizure are not invalidated solely because the officers had adequate time to procure a search or arrest warrant." *Doyle, supra,* 42 *N.J.* at 343, 200 *A.2d* 606; *see also United States v. Watson,* 423 *U.S.* 411, 417–18, 96 *S.Ct.* 820, 824–25, 46 *L.Ed.2d* 598, 605 (1976) ("the Court 'has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant' ") (quoting *Gerstein v. Pugh,* 420 *U.S.* 103, 113, 95 *S.Ct.* 854, 862, 43 *L.Ed.2d* 54, 65 (1975)). In *Doyle, supra,* 42 *N.J.* at 343, 200 *A.2d* 606, we were persuaded by the United States Supreme Court's rationale for declining to measure the reasonableness of an arrest or search by the practicality of obtaining a warrant, *viz:*

> A rule of thumb requiring that a search warrant always be procured whenever practicable may be appealing from the vantage point of easy administration. But we cannot agree that this requirement should be crystallized into a *sine qua non* to the reasonableness of a search. It is fallacious to judge events retrospectively and thus to determine, considering the time element alone, that there was time to procure a search warrant. Whether there was time may well be dependent upon considerations other than the ticking off of minutes or hours. The judgments of the officers as to when to close the trap on a criminal committing a crime in their presence or who they have reasonable cause to believe is committing a felony is not determined solely upon whether there was time to procure a search warrant. Some flexibility will be accorded officers engaged in daily battle with criminals for whose restraint criminal laws are essential. [*United States v. Rabinowitz,* 339 *U.S.* 56, 65–66, 70 *S.Ct.* 430, 435, 94 *L.Ed.* 653, 660 (1950).]

■ That reasoning remains persuasive. It is not a constitutional imperative for police officers to secure arrest warrants when practicable as long as the arrest is supported by probable cause. *See Watson, supra,* 423 *U.S.* at 423, 96 *S.Ct.* at 827, 46 *L.Ed.2d* at 609 (upholding warrantless arrest in public place). Thus, our inquiry in this case will focus not on whether an arrest warrant could have been obtained but on whether the arrest and accompa-

nying seizure of evidence were reasonable. *See State v. McKenna,* 228 *N.J.Super.* 468, 474, 550 *A.2d* 171 (App.Div.1988).

### III

■ Without question, Detective Boswell had the authority to effect a warrantless arrest of defendant in her apartment immediately after he purchased illegal narcotics there. Just as surely, his backup officers, once informed of the commission of the crime and the identity of the suspects, were authorized to effect a warrantless arrest in a public place. The question with which we are presented, however, is whether the backup team could make such an arrest in defendant's home after Detective Boswell had left the premises.

In *Payton, supra,* the United States Supreme Court held that absent exigent circumstances, a warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest violates the Fourth Amendment. 445 *U.S.* at 590, 100 *S.Ct.* at 1382, 63 *L.Ed.*2d at 653. This Court has likewise recognized the necessity for a warrant to effectuate entry into a home if no exigent circumstances exist that would excuse the securing of a warrant. *See Hutchins, supra,* 116 *N.J.* 457, 561 *A.2d* 1142 (holding that warrantless entry into home to effect search for evidence requires exigent circumstances).

In this case, the facts might well support a finding that the entry into the home was not undertaken to make "a routine felony arrest," and further that the entry was surrounded by exigent circumstances. Detective Boswell did not enter the apartment to make an arrest for a prior felony. When Detective Boswell entered the apartment, the crime—the felony—was first committed. Further, the crime involved more than one person. Detective Boswell refrained from making an arrest immediately and summoned additional police officers to assist in the arrest. We can readily infer that the delayed arrest was undertaken to protect Detective Boswell; it eliminated the danger inherent in attempting to effect an arrest single-handedly. Additionally, the

arrest by the backup team enabled the police to apprehend or detain additional offenders or suspects and also prevented the destruction of evidence.

The Appellate Division majority discounted any exigent circumstances, however, on the ground that they had been "police created." We need not address the issue of whether sufficient exigent circumstances existed to justify the entry into the apartment, followed by arrests, and, further, whether that exigency was created by the police.

Detective Boswell's initial entry into the apartment was consensual. No contrary argument or suggestion is made that it did not occur at the express invitation of defendant. As a result of that entry, probable cause—the commission of a crime—arose, justifying an arrest. The record further shows that the entry of the backup team followed relatively quickly after the initial entry. The testimony indicated that the time between the first entry by Detective Boswell and the second entry was fifteen to twenty minutes. At the suppression hearing one detective testified that approximately five minutes had elapsed between the time Detective Boswell radioed the backup officers that he had purchased drugs in defendant's apartment and the time they knocked on defendant's door to arrest the suspects. Another detective testified that about fifteen to twenty minutes had passed between the time Boswell went in to make the buy to the time the backup team went in to make the arrests.

In some contexts, substantial delay may undermine the validity of certain police actions that depend on facts giving rise to probable cause. *E.g., Spinelli v. United States*, 382 *F.*2d 871, 885 (8th Cir.1967) (noting that lengthy delay in execution of search caused by distance, traffic conditions, weather, and personal safety may be reasonable, whereas short delay may be unreasonable if due to lack of diligence or if purpose was to prejudice rights of suspect), *rev'd on other grounds*, 393 *U.S.* 410, 89 *S.Ct.* 584, 21 *L.Ed.*2d 637 (1969); *State v. Carangelo*, 151 *N.J.Super.* 138, 150, 376 *A.*2d 596 (Law Div.1977) (stating that "the key factor in

determining the validity of an untimely executed search warrant is the presence or absence of probable cause at the time of its execution"). However, we are not here confronted with a case characterized by a substantial break in the police action and a prolonged lapse of time between initial law-enforcement efforts and the ultimate arrest and seizure. Because the delay between the two entries was relatively brief and the occupants of the apartment had little opportunity to leave, it was not likely that the circumstances giving rise to the probable cause to make an immediate arrest on entering the premises would have dissipated or changed materially. We may thus reasonably infer that the probable cause to make an immediate arrest, which existed when Boswell first entered the apartment, continued, shortly thereafter, when the second entry was accomplished.

Further, the delay was justified. The purpose of the delay in arresting Vivian Henry, Terrell Henry, and Sharlene Wright was to ensure the personal safety of Detective Boswell. Here, Boswell saw two adults in addition to the three people involved in the drug sale and was unable to observe whether any adults were in the other rooms of the apartment. (In fact, two additional adults were present.) Further, as one of the detectives testified, weapons are usually found where illegal drugs are sold. *See United States v. Broomfield,* 336 *F.Supp.* 179, 184–85 (E.D.Mich.1972) (noting that because "drug trafficking itself is ... a violence-prone business," police can act in "apprehension that other persons may have been in the house who would have come to the aid of the defendant and could have caused harm to the agents"). Hence, Boswell's decision to leave the apartment and have the five officers of his backup team make the arrest was eminently reasonable under the circumstances. That police action not only ensured Boswell's safety, it also enabled the police to effectuate the arrests of multiple offenders, and, further, it reduced the risk that evidence, seizable as an incident to the arrests, would be destroyed.

Although no fresh or new invitation to enter the apartment was given to the police, the entry occurred shortly after the initial consent had been given for the initial entry, and was accomplished

without force or violence. Several other jurisdictions have determined that searches made during "buy-bust" operations may be reasonable in light of the circumstances surrounding the consent initially given. For instance, the Seventh Circuit has applied a doctrine called "consent once removed" to validate a backup team's entry immediately following an undercover agent's entry to purchase narcotics. In *United States v. Diaz*, 814 *F*.2d 454, *cert. denied*, 484 *U.S.* 857, 108 *S.Ct.* 166, 98 *L.Ed.*2d 120 (1987), the defendant invited an undercover agent into his hotel room, where they completed a drug transaction. The agent left the room, summoned his backup team, and then knocked on the defendant's door. When the defendant opened the door, the officers went inside and arrested him. The court held that the defendant had "effectively consented to the second entry by virtue of his consent to [the agent's] first entry.... [T]he fact that [the agent] momentarily stepped out to obtain help from other officers in making the arrest did not vitiate this consent." *Id.* at 459.

The *Diaz* court reasoned that the purpose behind the warrant requirement—to interpose a neutral and detached magistrate to protect individuals from unfounded invasions of their privacy—was of no moment in the present circumstances. "[S]uch an independent determination would not have prevented the intrusion. Diaz would have admitted [the agent] back into the hotel room, and ... the fact that he was assisted by other law enforcement officers in securing his arrest cannot make a constitutional difference." *Ibid.* The court, however, carefully circumscribed the reach of the consent-once-removed doctrine. It applied only where an agent or informant entered at the express invitation of someone with authority to consent, probable cause existed to arrest or search, and the agent immediately summoned help from other officers. *See ibid.; see also United States v. Paul,* 808 *F*.2d 645, 648 (7th Cir.1986) (holding that after consensual entry of confidential informant to make buy, informant can summon other agents to assist in arrest); *United States v. Janik,* 723 *F*.2d 537, 548 (7th Cir.1983) (holding that "when one invites an undercover agent into his house, the agent can summon other agents to assist in the arrest,

and the other agents are not guilty of a violation of the Fourth Amendment"); *United States v. Samet,* 794 *F.Supp.* 178, 182 (E.D.Va.1992) (ruling that warrantless entry by officers justified when police, on prearranged signal by undercover officer inside apartment by consent, broke into apartment with battering ram); *Lawrence v. State,* 388 *So.2d* 1250, 1253 (Fla.Dist.Ct.App.1980) (holding that defendants waived expectation of privacy when they admitted undercover officers onto premises, engaged in criminal activity in their presence, and officers left apartment to summon backup team to make arrests), *aff'd sub nom. Griffin v. State,* 419 *So.2d* 320 (1982).

Here, the separate entries can be viewed as components of a single, continuous, and integrated police action and were not interrupted or separated by an unduly prolonged delay. Moreover, from the standpoint of the interests protected by the Fourth Amendment, the importance of delaying the reentry and arrest to permit resort to a neutral magistrate for issuance of an arrest warrant was diminished by Detective Boswell's having observed the commission of a crime a few moments earlier. Unlike cases in which determination of the existence of probable cause sufficient to authorize issuance of a warrant to search a dwelling requires the intervention of a neutral magistrate, *see State v. Lewis,* 116 *N.J.* 477, 486–89, 561 *A.2d* 1153 (1989), the drug sale in which Detective Boswell participated eliminated any question of whether there existed probable cause to make an arrest. Under all the surrounding circumstances, the subsequent entry into defendant's apartment by the police to effectuate an arrest was reasonable in light of the earlier consent to enter and the continuation of probable cause to make an arrest.

The State also argues that some question exists concerning whether a home that has been turned into a retail drug outlet qualifies for the Fourth Amendment protection accorded a home. In *Lewis v. United States,* 385 *U.S.* 206, 211, 87 *S.Ct.* 424, 427, 17 *L.Ed.2d* 312, 316 (1966), the Court held that when a "home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is

entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street." Occupants thus waive their rights to privacy in their premises when they invite the public, whether private persons or police officers, inside to do business with them. *See id.* at 213, 87 *S.Ct.* at 428, 17 *L.Ed.*2d at 317 (Brennan, J., concurring). That notion comports with the principle that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 *U.S.* 347, 351, 88 *S.Ct.* 507, 511, 19 *L.Ed.*2d 576, 582 (1967).

In this case, defendant's home was being used as a place for distribution and sale of drugs. Defendant invited Detective Boswell into her apartment on the basis of three words: "Give me two." She understood those words to be a request for two vials of crack cocaine and directed the customer to her son, who would complete the sale. She closed the door behind her customer and allowed him to wait inside the apartment. Similarly, when the backup officers knocked on her door, she did not ask who was there before opening the door, but rather opened it immediately. It is also noteworthy that the backup team did not come armed with a battering ram or a sledgehammer or with the intention of making a forced entry, but rather made a peaceable entry preceded by a knock and followed by an announcement of their identity. *See State v. Hand,* 101 *N.J.Super.* 43, 48 n. 1, 242 *A.*2d 888 (Law Div.1968) (citing *Washington v. United States,* 263 *F.*2d 742, 744 (D.C.Cir.) (stating that "if there was probable cause to make an arrest ... there was justification for at least the peaceable entry which here was made"), *cert. denied,* 359 *U.S.* 1002, 79 *S.Ct.* 1142, 3 *L.Ed.*2d 1032 (1959)).

Because defendant had plainly opened her home to commercial drug traffic and had readily acquiesced in the nonforceable entries of the police officers, her complaint now that some of her supposed customers invaded the sanctity of her home appears flimsy. Nevertheless, although we are persuaded by *Lewis* that defendant had a lessened expectation of privacy in a home that doubled as a place of illicit business, ultimately we are convinced of the reason-

ableness of the warrantless entry in light of all the circumstances surrounding the entry. Those circumstances include the consensual basis for the initial entry, probable cause for an immediate arrest arising out of that entry, the short amount of time and continuity between the two entries, and the legitimate grounds for delaying the initial arrest until backup officers could arrive.

We hold that the conduct of the police in entering defendant's apartment to arrest her and others for an offense that the police had earlier witnessed was reasonable and violated neither the federal nor the New Jersey Constitution.

## IV

There remains the issue of whether the seizure of the vials of crack and the ten-dollar bills was also valid. In *Doyle*, we explained that

> when a person is arrested lawfully, with or without a warrant, a search of his person or of the things within his immediate possession or control, or of the place of arrest to the extent that it is within his immediate possession or control, is considered incidental to the arrest. [42 *N.J.* at 344, 200 *A.*2d 606.]

The police may also "fan out" and conduct a protective sweep of the area if they have reason to believe that they may be in danger from other parties on the premises. *See State v. Smith,* 140 *N.J.Super.* 368, 372, 356 *A.*2d 401 (App.Div.1976), *aff'd o.b.,* 75 *N.J.* 81, 379 *A.*2d 1275 (1977). The one thing they may not do, however, is use the arrest as a pretext to search for evidence. *See Hand, supra,* 101 *N.J.Super.* at 58, 242 *A.*2d 888.

At the suppression hearing, several detectives of the backup team testified that they had gone to 179 Norfolk Street to arrest the three suspects described by Detective Boswell, not to search the apartment. That testimony is supported by the fact that they seized only the two vials of crack sold to Boswell, the ten-dollar bills he used to pay for them, and the other vials that Sharlene Wright attempted to hide in the apartment and discard in the police car. They did not conduct an exploratory search of the apartment despite the fact that they had reason to believe that other contraband was present. We conclude, therefore, that their

seizure was the result of a reasonable search incident to a legal arrest and is valid.

## V

We reverse the judgment of the Appellate Division and reinstate defendant's conviction.

O'HERN, J., dissenting.

"Certain fundamental propositions bear restatement at the outset. The Fourth Amendment to the United States Constitution requires the approval of an impartial judicial officer based on probable cause before most searches may be undertaken. *E.g., Chambers v. Maroney,* 399 *U.S.* 42, 51, 90 *S.Ct.* 1975, 1981, 26 *L.Ed.*2d 419, 428, *reh. den.,* 400 *U.S.* 856, 91 *S.Ct.* 23, 27 *L.Ed.*2d 94 (1970). The same holds true for Article 1, paragraph 7 of the New Jersey Constitution. *State v. Ercolano,* 79 *N.J.* 25, 41–42 [397 *A.*2d 1062] (1979), and cases cited therein. The warrant requirement of these provisions may be dispensed with in only a few narrowly circumscribed exceptions. The *prima facie* invalidity of any warrantless search is overcome only if that search falls within one of the specific exceptions created by the United States Supreme Court. *Ercolano, supra,* 79 *N.J.* at 42 [397 *A.*2d 1062]. Where, as here, the State seeks to validate a warrantless search, it bears the burden of bringing it within one of those exceptions. *State v. Sims,* 75 *N.J.* 337, 352 [382 *A.*2d 638] (1978)." [*State v. Esteves,* 93 *N.J.* 498, 503, 461 *A.*2d 1128 (1983) (quoting *State v. Patino,* 83 *N.J.* 1, 7, 414 *A.*2d 1327 (1980)).]

"The problem with this case is that the search fits neatly into no category, although arguably fitting into several." *Ibid.*

In analyzing the validity of warrantless searches and here a warrantless entry, "the strands of constitutional exceptions to the Fourth Amendment must be kept untangled." *State v. Welsh,* 84 *N.J.* 346, 354, 419 *A.*2d 1123 (1980). The Court strains to fit this case into one of the specific exceptions created by the United States Supreme Court. The Appellate Division correctly concluded that the case simply does not fit into any of the recognized exceptions. I add only these observations.

Only recently we had occasion to consider a case, *State v. Lewis,* 116 *N.J.* 477, 561 *A.*2d 1153 (1989), almost identical in context except that the controlled buy was made by an undercover agent of the police rather than by a law-enforcement officer. In that case we reemphasized the heavy burden that must be overcome to justify a warrantless entry into a home:

.

"As the United States Supreme Court has acknowledged, 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' *United States v. United States Dist. Court*, 407 *U.S.* 297, 313 [92 *S.Ct.* 2125, 2134] 32 *L.Ed.*2d 752, 764 (1972). Accordingly, it is well established that 'searches and seizures inside a home without a warrant are presumptively unreasonable,' *Payton v. New York*, 445 *U.S.* 573, 586 [100 *S.Ct.* 1371, 1380] 63 *L.Ed.*2d 639, 651 (1980), and hence 'prohibited by the Fourth Amendment, absent probable cause and exigent circumstances.' *Welsh v. Wisconsin*, 466 *U.S.* 740, 749 [104 *S.Ct.* 2091, 2097] 80 *L.Ed.*2d 732, 743 (1984)." [*Id.* at 483, 561 *A.*2d 1153 (quoting *State v. Hutchins*, 116 *N.J.* 457, 463, 561 *A.*2d 1142 (1989)).]

We reviewed in *Hutchins, supra,* 116 *N.J.* 457, 561 *A.*2d 1142, the companion case of *Lewis,* the limited number of situations that have been categorized as exigent circumstances sufficient to overcome the warrant requirement. Among them are the hot pursuit of a fleeing armed felon, which is inapplicable here; the avoidance of serious injury to police officers or others; and the potential destruction of evidence. *Id.* at 464, 561 *A.*2d 1142.

In *Hutchins,* we set forth criteria for testing the validity of warrantless home entries in drug cases on the basis of exigent circumstances as drawn from the Third Circuit's decision in *United States v. Rubin,* 474 *F.*2d 262, *cert. denied sub nom., Agran v. United States,* 414 *U.S.* 833, 94 *S.Ct.* 173, 38 *L.Ed.*2d 68 (1973):

"(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail, and (5) the ready destructibility of the contraband and the knowledge 'that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.'" [116 *N.J.* at 465–66, 561 *A.*2d 1142 (quoting *Rubin, supra,* 474 *F.*2d at 268–69) (citations omitted).]

In *Lewis, supra,* 116 *N.J.* 477, 561 *A.*2d 1153, while considering the possibility of dangers to police officers guarding the site of the contraband while a search warrant is sought, we found that the circumstances presented "no practical impediment to the officers' securing the premises and maintaining surveillance until a written or telephonic warrant was procured." *Id.* at 488, 561 *A.*2d 1153. We emphasized that we are not trying to "second-guess police officers, but rather to establish guidelines within which objective-

ly-reasonable police action can be sustained." *Ibid.* Obviously the officers in this case could not have known about the Court's 1989 decision in *Lewis* at the time of this search in 1987. Nonetheless, we judge searches by whether they are objectively reasonable, not whether the officers were acting in good faith. This case is simply too close to the mold of *Lewis* for me to find a significant distinction, and thus I believe the Appellate Division correctly resolved the exigent-circumstances issue.

I am not satisfied that "consent once removed," *ante* at 115, 627 *A.*2d at 130, resolves the issue because that concept also could have been applied in the *Lewis* and *Hutchins* cases. In both cases the police had been informed that a person inside a house was dealing drugs. In both cases the police knocked on the door and the door was opened. On learning that the people at the door were police officers Hutchins ran and Lewis tried to shut the door. In neither case did we describe the opening of the door after the prior consensual admission of a police agent as involving a consent once removed, nor did we attempt to justify the searches on the basis that the premises had become a retail store for the sale of drugs. The case of *Lewis v. United States,* 385 *U.S.* 206, 87 *S.Ct.* 424, 17 *L.Ed.*2d 312 (1966), on which the majority relies, involved only evidence obtained from two buys that had occurred in the defendant's home on a specific invitation and not evidence seized pursuant to a warrantless entry of the home. No evidence in that case was obtained without the consent of the defendant. The equivalent in this case would be to admit in evidence the drugs originally purchased by the officer.

The majority opinion could be read as suggesting that a purchase of drugs could turn every home into a retail store for the sale of drugs and that any subsequent search and seizure could be justified under a consent-once-removed analysis. That approach would make obtaining a warrant unnecessary whenever the police or an agent have purchased drugs and the door is subsequently opened. Thus, our decision in *State v. Novembrino,* 105 *N.J.* 95, 519 *A.*2d 820 (1987), would become either moot or irrelevant to the

extent that it required a warrant based on probable cause before entry into premises where a drug transaction has taken place.

Some years ago, Justice Potter Stewart said that one of the problems with Fourth Amendment jurisprudence was that the Supreme Court had been unable to establish clear lines that could guide conduct of police officers. Potter Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 *Colum.L.Rev.* 1365, 1393 (1983). Our Court adds to that confusion in this case by its well-intentioned desire to create another exception to the warrant requirement. We might do better to emulate the Utah Supreme Court, which has attempted to simplify its search and seizure rules so that they may be more easily followed by the police and courts and at the same time provide the public with consistent and predictable protection against unreasonable searches and seizures. See *State v. LaRocco*, 794 *P*.2d 460 (1990). That court ruled:

> This can be accomplished by eliminating some of the confusing exceptions to the warrant requirement * * *. * * * [W]arrantless searches will be permitted only where they satisfy their traditional justification, namely, to protect the safety of police or the public or to prevent the destruction of evidence. [*Id.* at 469–70 (citations omitted).]

Obviously the case would be different had the police officer made the arrest when the buy was concluded and called for the backup team to enter. Avoidance of serious injury to officers is a recognized basis for an exception to the warrant requirement. To obtain a warrant in the circumstances of this case would not have increased the risk of serious injury to the police. Nor does the record suggest that the drug offenders were in any way aware of the police presence and were likely to destroy or remove the evidence. The warrantless entry to arrest for a drug offense did not meet the requirements of our decisions in *Hutchins* and *Lewis*. Therefore, I would affirm the judgment of the Appellate Division.

CLIFFORD and POLLOCK, JJ., join in this opinion.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices HANDLER, GARIBALDI and STEIN—4.

*For affirmance*—Justices CLIFFORD, POLLOCK and O'HERN—3.